UNITED STATES of America ex rel. Robert R. PURCELL, Plaintiff,

v.

MWI CORPORATION and J. David Eller, Defendants.

Civil Action No. 98–2088(RMU).

United States District Court, District of Columbia.

Nov. 6, 2007.

Joseph J. Aronica, Duane Morris, David B. Wiseman, Michael D. Granston, U.S. Department of Justice, Roscoe Howard, Jr., Troutman Sanders LLP, Keith V. Morgan, U.S. Attorney's Office, Washington, DC, for Plaintiff.

Michael J. Madigan, Evangeline C. Paschal, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, James F. Carroll, Conrad & Scherer, LLP, Ft. Lauderdale, FL, for Defendants.

## MEMORANDUM OPINION

Granting Defendant Eller's Motion For Summary Judgment; Denying Defendants' Joint Motion for Summary Judgment; Granting In Part the Plaintiff's Motion for Partial Summary Judgment; Granting the Plaintiff's Motion to File a Sur-Reply

RICARDO M. URBINA, District Judge.

### I. INTRODUCTION

Cross motions for summary judgment

present the court with this *qui tam*[1] action involving pump equipment sales to Nigeria. Robert Purcell (the "relator") brought suit pursuant to the False Claims Act ("FCA") against his former employer, Moving Water Industries, Inc. ("MWI"), a manufacturer of industrial pumps. The government subsequently intervened, bringing suit on its own accord against MWI and its former president and majority shareholder, J. David Eller (collectively, the "defendants"). At its core, the complaint alleges that the defendants failed to disclose irregular commissions paid to their Nigerian sales agent Alhaji Mohammed Indimi from 1992–1994, in contravention of certifications signed by the defendants to the United States Export–Import Bank ("Ex–Im"), which helped finance the pump sales.

Agreeing with Eller that the FCA claims against him are time barred and that the common law claims fail to show that the government conferred a benefit on him, the court grants his motion for summary judgment and denies the government's motion for partial summary judgment as against him. Agreeing with the government that the omission of the Indimi commissions constituted a violation of the terms of the supplier's certificates, the court grants the government's motion for partial summary judgment as against MWI and, accordingly, denies the defendants' joint motion for summary judgment.

## II. BACKGROUND

### A. Factual History

The following is undisputed. In the early 1990s MWI, a Florida corporation, arranged to sell irrigation pumps and other equipment to seven Nigerian states. Gov't's Compl. ¶¶ 8, 11. To finance the pump sales, Ex–Im made eight loans totaling $74.3 million to Nigeria in 1992. *Id.* ¶¶ 12–13. MWI received regular payments through a London bank which was then reimbursed by Ex–Im. *Id.* ¶ 14.

Before Ex–Im would approve the bank reimbursements, however, it required MWI to submit a "supplier's certificate" certifying that it had not paid any irregular commissions or other payments in connection with the pump sales. *Id.* ¶¶ 15–16. In turn, before the bank would release each payment to MWI, the company had to submit an additional supplier's certificate again certifying that it had not paid commissions or other payments in connection with the pump sales. *Id.* ¶ 17. Accordingly, MWI submitted supplier's certificates to obtain Ex–Im approval of the bank reimbursements, and submitted 48 additional supplier's certificates for each of its payments from the bank. *Id.* ¶¶ 16, 18. On the supplier's certificates, 43 of which were signed by Eller, MWI certified that it had not paid any irregular commissions or made other payments in connection with the pump sales. *Id.* ¶¶ 19, 21.

The government alleges that these certifications were false. *Id.* ¶¶ 24, 35. Specifically, the government claims that the defendants failed to disclose on the supplier's certificates that they had paid $28 million in "excessive, highly irregular" commissions to their Nigerian sales representative, Indimi, to obtain the pump sales. *Id.* ¶¶ 22–27. The government contends these commissions represented 34% of the sales price of the pumps. Gov't's Mot. for Partial Summ. J. at 1. MWI contends that Indimi's compensation totaled no more

---

1. *Qui tam* is a convenient short hand for the phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, meaning "who pursues this action on our Lord the King's behalf as well as his own." *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769 n. 1, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

than $26.2 million, reflecting aggregate commissions of 31.75%. Defs.' Mot. for Summ. J. at 3. At the time of this project, MWI's policy was to pay its other sales agents a commission of 10% of the standard discounted sale price plus half of any amount received over that price. Gov't's Mot. for Partial Summ. J. at 7, Ex. 10 ("Roegiers Dep.") at 11–12. With the exception of Indimi's commission, MWI's commission payments between January 1, 1990 and December 31, 1994—a period encompassing the Nigerian sales and 70 other MWI transactions—averaged $13,956 or 9%. Gov't's Mot. for Partial Summ. J. at 8.

## B. Procedural History

The FCA imposes liability for civil penalties and treble damages on any person who submits or causes false claims to be submitted to the federal government. 31 U.S.C. § 3729. Under § 3730 of the FCA, a private person—known as the "relator"—may bring an FCA action in the name of the government. *Id.* § 3730(b). The relator must file the complaint *in camera* and under seal, and may not serve it upon the defendant until the court so orders. *Id.* The relator must serve a copy of the complaint on the government, however, which then has 60 days (subject to court-approved extensions of time) to elect to intervene in the case. *Id.* If the government elects to intervene, it has primary responsibility for prosecuting the action and is not bound by the actions of the relator, who may continue as a party to the action. *Id.* § 3730(c). If the government chooses not to intervene, the relator has the right to conduct the action. *Id.*

Section 3731(b) of the FCA establishes a two-pronged statute of limitations for FCA actions. 31 U.S.C. § 3731. First, § 3731(b)(1) limits FCA actions to those brought within six years of the date of the FCA violation. *Id.* § 3731(b)(1). Alterna-

tively, § 3731(b)(2) limits FCA actions to those brought within three years of the date "when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act[.]" *Id.* § 3731(b)(2).

For the purposes of Eller's motion for summary judgment, the content and filing date of the two complaints are particularly significant, and therefore merit comparison. On August 27, 1998, nearly four years after the defendants submitted their last supplier's certificate, the relator, a former management-level employee of MWI, filed his complaint and transmitted to the Attorney General a statement of material evidence comprising *inter alia:* the relator's complaint describing Eller as the "current President and Chief Executive Officer" of MWI as well as its owner, through the J. David Eller & Children Trust, of 100% of MWI's stock, Relator's Compl. ¶ 19; an allegedly false supplier's certificate executed by Eller, Def. Eller's Statement of Undisputed Mat. Facts ("Eller's Statement") ¶ 8; and a commission agreement signed by Eller providing that Indimi would receive a commission of 30%, Eller's Mot. for Summ. J. at 10. In his complaint, the relator names MWI as the sole defendant based on one count that describes several FCA violations. *Id.* ¶¶ 4, 11–17. Specifically, the relator's complaint describes MWI's pump sales to the seven Nigerian states, the $74 million in Ex–Im loan guarantees, the allegedly fraudulent supplier's certificates and the allegedly undisclosed commissions to MWI's sales representative that found their way to various Nigerian officials. *E.g., id.* ¶¶ 11–13, 15–16. The complaint also discusses MWI's increased use of Ex–Im financing for its Nigerian sales, alleges that MWI attempted to promote sales in Nigeria by creating an artificial need for its equipment, and

claims that MWI developed deceptive equipment descriptions to avoid price comparisons with similar goods. *Id.* ¶¶ 23–31, 47–49. The relator's complaint contains one count under FCA charging MWI with knowingly causing the submission of false or fraudulent claims for payment or approval, knowingly making false records or statements to obtain government payment of false or fraudulent claims and conspiring to defraud the government. *Id.* ¶¶ 50–55. The relator seeks treble damages and civil penalties under the FCA. *Id.* ¶¶ 24–25.

The government filed its complaint on April 4, 2002, nearly eight years after the defendants submitted their last certificate. Gov't's Compl. ¶¶ 11–45. In contrast to the relator, the government names both MWI and Eller as defendants. *Id.* ¶¶ 6–7, 52–56. It also contains not one but four counts relating to the defendants' alleged actions. *Id.* ¶¶ 46–56. Of the four counts, the first two allege the same FCA violations as the relator's complaint: (1) knowingly causing the presentation of false or fraudulent claims for payment or approval and (2) knowingly making false records and statements to obtain government payment of false or fraudulent claims. *Id.* ¶¶ 46–51. The third and fourth counts ("the common law claims") allege, respectively, that the defendants were unjustly enriched by the United States, which mistakenly made payments to them. *Id.* ¶¶ 52–56. The government seeks treble damages and civil penalties under the FCA and common law equitable principles. *Id.* ¶¶ 1, 57.

Eller moved to dismiss the government's FCA allegations against him on the grounds that they were time barred. *Id.* ¶ 21. On March 25, 2003, the court denied the motion, finding that, in the current pre-discovery posture of the case, it lacked the factual "detail necessary to determine when the official of the United States charged with responsibility to act in the circumstances knew or should have known of the facts material to the right of actions." Mem. Op. (Mar. 25, 2003) at 14 (internal quotations omitted). Discovery closed on January 26, 2005. Minute Order (Dec. 13, 2004). On March 26, 2007, the parties each filed respective motions for summary judgment, which the court resolves below.

## III. ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505.

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations ... with facts in the record," *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999) (quoting *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993)), or provides "direct testimonial evidence," *Arrington v. United States,* 473 F.3d 329, 338 (D.C.Cir.2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene,* 164 F.3d at 675.

## B. The Court Grants the Plaintiff's Motion for Leave to File a Sur–Reply

■ The government attached the affidavit of former FBI agent Phyllis Sciacca to its combined opposition to the defendants' summary judgment motions. Gov't's Opp'n, Ex. 14 ("Sciacca Affidavit"). Eller filed a reply requesting that the court either strike the affidavit or afford him an opportunity to depose Sciacca, as the government had never before disclosed her as a witness. Def. Eller's Reply at 5 n. 3. The government then filed a motion for leave to file a surreply but directed its arguments to whether the affidavit should be stricken. Gov't's Mot. for Leave to File a Three–Page Sur–Reply ("Gov't's Sur–Reply Mot."). Eller objected and likewise limited his arguments to the appropriateness of the affidavit. Def. Eller's Response to Gov't's Mot. for Leave to File a Sur–Reply ("Def. Eller's Response") at 1. Neither party proffered reasons as to whether leave to file the sur-reply should, in the first place, be granted.[2]

■ The decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the court. *Am. Forest & Paper Ass'n, Inc. v. EPA,* 1996 WL 509601, at *3 (D.D.C. Sept.4, 1996). If the movant raises arguments for the first time in his reply to the nonmovant's opposition, the court will either ignore those arguments in resolving the motion or provide the nonmovant an opportunity to respond to those arguments by granting leave to file a sur-reply. *Ben–Kotel v. Howard Univ.,* 319 F.3d 532, 536 (D.C.Cir.2003); *Natural Res. Def. Council, Inc. v. EPA,* 25 F.3d 1063, 1072 n. 4 (D.C.Cir.1994); *Pa. Elec. Co. v. Fed. Energy Regulatory Comm'n,* 11 F.3d 207, 209 (D.C.Cir.1993); *see also Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 195 (D.C.Cir.1992) (acknowledging that consideration of arguments raised for the first time in a reply would be "manifestly unfair" to the respondent); *Corson & Gruman Co. v. Nat'l Labor Relations Bd.,* 899 F.2d 47, 50 n. 4 (D.C.Cir. 1990) (requiring parties to raise all of their arguments in their opening briefs "to prevent sandbagging"); *Robinson v. Detroit News, Inc.,* 211 F.Supp.2d 101, 113 (D.D.C. 2002) (denying leave to file a sur-reply

---

**2.** Eller spares one sentence to assure the court that "the issue raised in the surreply does not warrant additional briefing." Def. Eller's Response to Gov't's Mot. for Leave to File a SurReply ("Def. Eller's Response") at

1. A "single conclusory sentence," however, cannot substitute for a properly raised argument. *Cement Kiln Recycling Coalition v. EPA,* 255 F.3d 855, 869 (D.C.Cir.2001).

where the proposed surreply merely reiterated prior arguments); *Lewis v. Rumsfeld,* 154 F.Supp.2d 56, 61 (D.D.C.2001) (denying leave to file a sur-reply where the plaintiff failed to demonstrate that the defendant's reply presented any new matters).

■ Because the objection to the Sciacca affidavit first appeared in the defendant's reply, the government had no opportunity to rebut it during the ordinary course of briefing. *Corson & Gruman Co.,* 899 F.2d at 50 n. 4. The defendant's objection to the Sciacca affidavit presents a new issue. *Lewis,* 154 F.Supp.2d at 61. Consideration of the government's sur-reply (and the defendant's substantive challenges thereto) furthers the interests of fairness and elucidation of the law through the adversarial process. *Herbert,* 974 F.2d at 195. The court, therefore, grants the government an opportunity to defend the affidavit's inclusion in the catalogue of evidence by way of the sur-reply. The more difficult question—whether to exclude the affidavit—follows.

## C. The Court Declines to Strike the Sciacca Affidavit

Principally, the affidavit relates two interviews that an FBI agent held with MWI employees: the first, on April 21, 1999 with Juan Ponce, former MWI Vice President of International Sales; the second, on January 12, 2000 with Neal Lang, a financial officer with MWI. Sciacca Aff. ¶ 2, 7. The affidavit purportedly supports the government's position that it first learned of Eller's involvement during these interviews (rather than from the relator's shared materials), and that, therefore, the statute of limitations did not begin ticking until April 21, 1999, at the earliest—less

than three years before the government filed its complaint. Gov't's Opp'n at 34

Eller objects to the affidavit, complaining that the government failed to disclose Sciacca's identity pursuant to Federal Rule of Civil Procedure 26(a)(1)(A). Def. Eller's Reply at 5. He urges that the court strike Sciacca's affidavit in accord with Federal Rule of Civil Procedure 37(c)(1), which provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R.CIV.P. 37(c)(1). The government essentially pleads equity, claiming that because Eller did not conduct any discovery on the statute of limitations issue it believed he had abandoned it. Gov't's Sur–Reply at 1. Moreover, Agent Sciacca's interviews with Eller's senior employees allegedly placed him on notice that she had information relevant to the statute of limitations issue. *Id.*

At best, the government's arguments strain credulity; at worst, they purposefully mislead. The government has been litigating this matter for over five years, in which time the parties have engaged in multiple discovery disputes such as the one outlined above. *See, e.g.,* Mem. Op. (Aug. 26, 2002); Order (Dec. 14, 2004); Order (Feb. 3, 2005); Order (July 21, 2005); Mem. Op. (Nov. 14, 2005). As recently as December 13, 2005, Eller sought the government's interview notes with the relator, describing them as "crucial to Defendant's Eller's impending motion for summary judgment on statute of limitations grounds." [3] Def. Eller's Mot. for Recon-

---

**3.** In fact, Eller raised this defense in his answer and in two discovery interrogatories to the government seeking "[a]ll documents re-

ferring or related to the United States' investigative files in this case, including but not limited to reports of interviews." Def. Eller's

sid. at 1–2. Thus, when the government states that Eller "did not conduct *any* discovery on the statute of limitations issue," Gov't's Sur–Reply at 1, it is distorting the record beyond recognition.

■ As for the proposition that Agent Sciacca's interviews with MWI employees two years before Eller became a party constituted knowledge on Eller's part that she was a potential witness, the government itself seems to recognize the weakness of this inferential argument, backtracking that "[e]ven if defendant Eller was not aware of Agent Sciacca by name as a result of her interviews of Roegiers and Lang, he was well aware of the government's investigation." *Id.* at 2 n. 2. This hardly qualifies as the sort of specific knowledge of the identity of a witness required to excuse a failure to disclose. *Cf. Bell v. Gonzales*, 2005 WL 3555490, at *7 (D.D.C. Dec.23, 2005) (excusing failure to disclose because it was "inadvertent, and went largely unnoticed because of the frequent mention of [the witness] by both parties as one who had relevant information"). Nor can the court consider Sciacca's affidavit to be of merely tangential evidentiary value—the affidavit constitutes precisely the sort of information that the court sought in deferring its finding on Eller's statute of limitations defense. Mem. Op. (Mar. 25, 2003) at 14. Because the government was (or should have been) aware of Agent Sciacca's value as a witness from the beginning of the case, the court cannot entertain its claim that her omission was substantially justified. *Cf. Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir.2004) (finding an omission of a witness "substantially justified" when par-

ty with duty to disclose was not initially aware of witness).

■ Nevertheless, the court refrains from striking the affidavit because it concludes that its admission is harmless. The harm from the failure to disclose a witness flows from the unfair surprise hindering the prejudiced party's ability to examine and contest that witness' evidence. *Muldrow ex rel. Estate of Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 168 (D.C.Cir. 2007). Although Eller asks the court, in alternative to striking the affidavit, to afford him an opportunity to depose Sciacca, Def. Eller's Reply at 5 n. 3, he has not filed an affidavit outlining his reasons for needing further discovery as contemplated by Rule 56(f). This alone is sufficient to dissuade the court from delaying its ruling to grant such relief. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir.1992) (ruling that unverified statements alleging a need for a continuance on a motion for summary judgment pending further discovery were insufficient grounds for a continuance under Rule 56(f), noting that "[a]dvocacy by counsel does not suffice for evidence or fact in the Rule 56(f) context") (citation omitted); *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir.2000). Moreover, the court has already held in a prior ruling that the relator's materials satisfy the defendant's "substantial need" for evidence regarding when the government first learned it had a viable claim against Eller. Mem. Order (Nov. 14, 2005) at 6. Sciacca's affidavit does not disturb that finding. And, as a dispositive consideration, the court concludes in the proceeding discussion that

Reply at 3, Gov't's Resp. to Defs.' Req. for Doc. No. 18. At that time, the government withheld responses to both interrogatories, citing the investigative files privilege. *Id.;* Gov't's Opp'n to Def.'s Mot. to Compel (Sept. 22, 2005) at 7 n. 5. The defendant filed a

motion to compel which the court denied, concluding that, because Eller now had access to the relator's materials, he had not demonstrated a substantial need sufficient to override the government's claim of privilege. Mem. Order (Nov. 14, 2005) at 5–7.

the statute of limitations bars the government's claims against Eller—notwithstanding the evidence conveyed in the Sciacca affidavit. While this does not excuse the government's negligence, it does render it harmless, extinguishing any cause for striking the affidavit.

### D. The Government's FCA Claims Against Defendant Eller are Time Barred

Eller argues that the government's FCA claims against him are time barred because it failed to file a complaint for "[m]ore than 3 years after the date when facts material to the right of action are known or reasonably should have been known." Def. Eller's Mot. for Summ. J. at 6 (quoting 31 U.S.C. § 3731(b)). He first argued this point in a motion to dismiss filed on May 28, 2002, which the court denied, explaining:

> At this point, there simply are not enough facts in the record for this court to make that determination. Thus far, the court is aware of two pieces of information: first, that the relator's complaint spurred some sort of criminal investigation of the defendants, and second, that the relator's complaint noted Mr. Eller's company position, political leanings, and signatures on the supplier's certificates. Neither item provides the court with the detail necessary to determine when the "official of the United States charged with responsibility to act in the circumstances" knew or should have known of the facts material to the right of action.

Mem. Op. (Mar. 25, 2003) at 13–14. Since this ruling, the defendant has gained access to the relator's statement of material evidence and now re-argues that the material facts of the government's FCA claims are disclosed in Eller's "signature on the supplier certificates that the government alleges are false and his knowledge of the commission that Indimi was paid on each loan." Def. Eller's Mot. for Summ. J. at 6.

The government argues that the relator's filings did not contain corroborating evidence or "even allege that Mr. Eller knew that his certifications were false." Gov't's Opp'n at 33. To substantiate the allegations, the government claims it needed evidence of the commissions paid by MWI to other agents as well as evidence that Eller knew that these commissions differed from the Indimi commissions. *Id.* at 34. The government had no such proof until Agent Sciacca interviewed Juan Ponce on April 21, 1999, at which time Ponce disclosed that Eller had approved all the advances to Indimi and was aware that Indimi was using them to pay Nigerian officials in connection with sales. *Id.* at 35.

▬▬▬ Statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (quoting *R.R. Telegraphers. v. Ry. Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 88 L.Ed. 788 (1944)). Statutes of limitations are designed to

> afford[ ] plaintiffs what the legislature deems a reasonable time to present their claims [while simultaneously] protecting defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

*Kubrick*, 444 U.S. at 117, 100 S.Ct. 352 (citing, *inter alia, United States v. Mar-*

*ion,* 404 U.S. 307, 322, n. 14, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Accordingly, courts "are not free to construe [a statute of limitations] so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims." *Id.*

 The timeliness of a plaintiff's complaint under § 3731(b)(2) of the FCA depends on a determination of when the fraud at issue was known or reasonably should have been known. *United States v. Intrados/Int'l Mgmt. Group,* 265 F.Supp.2d 1, 12 (D.D.C.2002). In making the determination of whether a plaintiff "should have known" facts material to the right of action, courts apply a "discovery-due diligence" standard. *Sprint Commc'ns Co. v. FCC,* 76 F.3d 1221 (D.C.Cir.1995); *Riddell v. Riddell Wash. Corp.,* 866 F.2d 1480 (D.C.Cir.1989); *Richards v. Mileski,* 662 F.2d 65 (D.C.Cir. 1981); *Fitzgerald v. Seamans,* 553 F.2d 220 (D.C.Cir.1977). Under the "discovery-due diligence" standard, the running of the statute of limitations does not begin at the point the plaintiff has sufficient information to prevail at trial, or even when a plaintiff is aware that the conduct at issue is actionable under the law. Rather, it begins to run when the government official charged with bringing the civil action "discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Fitzgerald,* 553 F.2d at 228. That is, the limitations period starts to run on "the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." *Loughlin v. United States,* 230 F.Supp.2d 26, 40 (D.D.C.2002) (quoting *Zeleznik v. United States,* 770 F.2d 20, 23 (3d Cir.1985)). In cases where defendants have not engaged in affirmative acts of fraudulent concealment, a plaintiff is deemed to have sufficient notice of critical facts to set the statute of limitations running if the plaintiff has inquiry notice of the injury and its cause. *Kubrick,* 444 U.S. at 120, 100 S.Ct. 352; *Sprint,* 76 F.3d at 1228 (citing *Riddell,* 866 F.2d at 1491).

Here, the parties agree that no fraudulent concealment occurred. The only question, then, is at what point was the government on notice of the injury alleged in the complaint. *U.S. ex rel. Miller v. Bill Harbert Intern. Const.,* 505 F.Supp.2d 1, 7–8 (D.D.C.2007). Because the defendant raises this argument in a motion for summary judgment, if the court determines that a reasonable juror could find that the government was not on notice of the injury before April 4, 1999—three years before it filed its complaint—then the court must deny the motion. FED. R.CIV.P. 56(c); *see also Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

 The government's complaint contains (aside from the common law claims) one count of false claims and one count of false statements. Gov't's Compl. at ¶¶ 46–51. To establish the former, the government must prove that the defendant knowingly submitted a false, material claim to the government. *U.S. ex rel. Schmidt v. Zimmer,* 386 F.3d 235, 242 (3d Cir.2004). To establish the latter, the government must prove that the defendant knowingly submitted a false, material statement. *Shaw v. AAA Eng'g & Drafting, Inc.,* 213 F.3d 519, 531–32 (10th Cir.2000). The government claims that the relator's statement did not notify the government of a potential claim, because the statement fails to provide sufficient evidence that the certifications were "false"; i.e., the statement includes no information about the commissions paid by MWI to other agents or about Eller's knowledge of a variance in commissions within his firm. Gov't's Opp'n at 34.

■ Contrary to the government's pro-testations, the relator's complaint and statement of material evidence did provide the government (specifically, the Department of Justice) with evidence supporting at least the beginnings of its current case against the defendant. The government knew that MWI had made pump sales to Nigeria through Ex–Im loans approximating $74 million. Def. Eller's Mot. for Summ. J., Ex. A ("Relator's Statement") at 13. The government knew that Nigerian law allegedly capped commissions at 2%. *Id.* at 14. The government knew that Eller, in his capacity as President and CEO of MWI, had approved a commission for Indimi of around 30% for multiple-million-dollar sales. Relator's Statement at 241. The government knew that a former management-level employee of MWI had accused Eller, in failing to disclose Indimi's commissions, of fraudulently signing supplier's certificates. Relator's Statement at 25–26. The government knew that Eller as sole owner of MWI, Relator's Compl. ¶ 19, would reap a windfall from the multi-million dollar Nigerian sales. *See U.S. ex rel. Miller,* 505 F.Supp.2d at 11 n. 14 (D.D.C.2007). The government interviewed relator about his statement and complaint in December 1998, at which time it was free to explore any and all of these preliminary facts. Def. Eller's Statement ¶ 13.

Furthermore, it is upon these very facts that the government lays its foundation for its motion for partial summary judgment. *See* Gov't's Mot. for Partial Summ. J. at 9 (describing a $28 million commission as "unconscionable" and "beyond the pail") and 22–23 (referencing supplier's certificates to show that Eller submitted a material claim). That the above facts did not include the particular and specific information of what MWI paid its other agents is a disingenuous and, in any event, inapt objection. It is disingenuous because the

government has proposed numerous definitions for what constitutes a "regular commission." The government has at one time stated: "[O]ne factor that the EXIM takes into account is the reasonableness of the rate, or amount, of the commission," which, in Indimi's case, led the government to conclude that "the amount of MWI's commission payments to Alhaji Indimi were unreasonable and excessive." Def. Eller's Mot. for Summ. J. at 7, Ex. B (Gov't's Responses and Objections to Def. MWI's First Set of Interrogatories to the Gov't, No. 6). In a more recent filing, the government has stated that "the government's consistent position ... is that 'regular commission' ... means those commissions that are normally and typically paid to sales agents in the industry." Gov't's Reply In Support of Its Mot. for Partial Summ. J. ("Gov't's Reply") at 3. And in its briefing on Eller's statute of limitations defense, the government maintained that it had no inkling of a potential FCA violation before learning what MWI paid its other sales agents. Gov't's Opp'n at 33–34. For the government to brandish its most-recently proffered legal standard in order to parry the thrust of the defendant's statute of limitations defense when in the past it has been content to rely on a multitude of alternative standards attests to a shortcoming of sincerity.

■ The government's objection is inapt because the limitations period starts to run on "the first date that the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." *Loughlin v. United States,* 230 F.Supp.2d 26, 40 (D.D.C.2002) (quoting *Zeleznik,* 770 F.2d at 23 (3d Cir.1985)). Thus, a plaintiff may be on notice even where, as here, the "extent and precise nature of [an] injury" remains unclear.

*See Fitzgerald,* 553 F.2d at 227. While the government hotly disputes the defendants' assertion that at the time of the Nigerian sales "there was no understanding among Exim staff as to what constituted a regular commission," Gov't's Joint Response to Defs.' Statement of Undisputed Facts ("Gov't's Statement") at 8, ¶ 4, the government can point to no written regulation, notice, statute, or order clarifying the definition of "regular commission." *See generally* Gov't's Response to Defs.' Statement of Undisputed Facts. To permit the government to plead ignorance amidst this plethora of interpretive possibilities would be to condone willful blindness on the part of a plaintiff who bore the duty of recognizing (absent an unambiguous indication of the law to the contrary) that an investigation was warranted to determine whether redress was due. *Loughlin,* 230 F.Supp.2d at 40. A plaintiff cannot sit on his hands and plead confusion; to do so subverts the purpose of the statute of limitations and exploits the equities of the tolling doctrine. *Kubrick,* 444 U.S. at 117, 100 S.Ct. 352. The government would have the court defer a finding of inquiry notice until after a claim has been confirmed rather than merely discerned, but this would effectively substitute a rigorous actual notice standard for a threshold inquiry notice standard, an approach justified only when the defendant has fraudulently concealed his wrongdoing. *Riddell,* 866 F.2d at 1491. Eller's position, actions, motives and power—as revealed in the relator's materials—all reinforce the suspicion that he had possibly committed a wrongful act. It is unfortunate that because of dilatory filing the government cannot vindicate its suspicions with an adjudication on the merits. But Congress has already weighed these equities. *Kubrick,* 444 U.S. at 117, 100 S.Ct. 352. Abiding by Congress' balance, the court concludes that the FCA claims against defendant Eller are time barred.

**E. The Common Law Claims Against Eller Fail Because the Government Has Introduced Insufficient Evidence to Establish that Ex–Im Conferred a Benefit Upon Him**

Eller also challenges the government's common law claims against him. He argues that because the government cannot prove that Ex–Im conferred a benefit on him directly, it cannot establish the predicate for either its unjust enrichment or payment by mistake of fact claim. Def. Eller's Mot. for Summ. J. at 13, 16. Absent any indication that Eller "acted outside his capacity as officer or shareholder and received a personal benefit in addition to any benefit conferred on the corporation," the defendant maintains that the government cannot pierce the corporate veil to recover from him. *Id.* at 14. The government responds that Eller did directly benefit from the Nigerian sales because he and his family were the sole shareholders of MWI. Gov't's Opp'n at 45 (citing *U.S. ex rel. Piacentile v. Wolk,* 1995 WL 20833, at *1 (E.D.Pa. Jan.17, 1995)).[4] Moreover, because Eller allegedly participated in the fraud that induced Ex–Im to make the payments in the first place, the government concludes that he cannot evade liability. *Id.* at 46 (citing *LTV Educ. Sys., Inc. v. Bell,* 862 F.2d 1168, 1175 (5th Cir.1989)).

**4.** The government also notes that the Nigerian sales equaled 400% of MWI's annual revenue and that Eller made several trips to the Caribbean to deposit large duffel bags of cash in offshore accounts. Gov't's Opp'n at 45. Because the government has not submitted any evidence to establish a nexus between these allegations, however, the court will not automatically infer one in a summary judgment proceeding. *See Celotex Corp.,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

To prove unjust enrichment, a plaintiff must show that he conferred a legally cognizable benefit on the defendant, that the defendant possessed an appreciation or knowledge of the benefit and that the defendant accepted or retained the benefit under inequitable circumstances. *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F.Supp.2d 30, 50 (D.D.C.2003); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am. v. Ass'n of Flight Attendants, AFL–CIO*, 864 F.2d 173, 177 (D.C.Cir.1988). Payment by mistake likewise only lies against a defendant to whom a benefit (money) was actually paid. *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 505 F.Supp.2d 20, 23–24 (D.D.C.2007) (describing claims as "essentially duplicative of each other").

Here, the defendant is a stockholder of a corporation that received a benefit from the plaintiff. The plaintiff may only rely on an inference that a stockholder by means of his corporate equity received a benefit if the plaintiff shows that the stockholder abused the corporate form, using it as his own alter ego to perpetrate fraud—in which case, the corporate veil should be pierced. *E.g., Robertson–Ceco Corp. v. Cornelius*, 2007 WL 1020326, at *5 n. 6 (N.D.Fla. Mar.30, 2007) (quoting *Munder v. Circle One Condo., Inc.*, 596 So.2d 144, 145 (Fla. 4th DCA 1992) (holding that the corporate veil may be pierced and stockholders held personally liable if there is "fraud, self-dealing, unjust enrichment and betrayal of trust")).

In this case, any benefit was conferred on the corporation and not the individual defendant. *See Metalmeccanica Del Tiberina v. Kelleher*, 2005 WL 2901894, at *4 (4th Cir.2005) (explaining that "[a]t most, [the plaintiff] can demonstrate that [the defendant corporation], as opposed to [its owner], received a nongratuitous benefit .... [and][a]ny benefit [the owner] received came from [the corporation]—not [the plaintiff]). Thus, while the government may levy an unjust enrichment claim against MWI, it may not levy one against Eller without first successfully piercing the corporate veil." *Id.*

The government has proffered no viable basis for doing so here. *See, e.g., Quinn v. Butz*, 510 F.2d 743, (D.C.Cir.1975) (stating that a "corporation is ordinarily to be viewed as a distinct entity, even when it is wholly owned by a single individual .... [unless] the corporation is simply the alter ego of its owner[ ]"); *U.S. ex rel. Siewick v. Jamieson Sci. and Eng'g, Inc.*, 322 F.3d 738, 741 (D.C.Cir.2003) (affirming that "an allegation of fraud against the United States in violation of the False Claims Act does not amount to an allegation that the corporate form was a fraud"). The government, therefore, cannot maintain its unjust enrichment claims against Eller. Because the payment by mistake of fact claim suffers the same fatal deficiency, it too cannot survive. Summary judgment in favor of Eller is, thus, appropriate on the common law claims. *See, e.g., Brumbelow v. Law Offices of Bennett and Deloney, P.C.*, 372 F.Supp.2d 615, 622–23 (D.Utah 2005); *Citronelle–Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871, 881 (D.Ala. 1980) (holding that "because restitution is predicated upon a finding of unjust enrichment, however, [the majority-stockholder defendant] would be individually liable only to the extent that he received proceeds from [corporate] sales") (citing George E. Palmer, Law of Restitution, §§ 2.1, 2.10 (1978)).[5]

---

5. Because the court disposes of the claims in the above manner, it need not resolve the question (elucidated in supplemental briefing) of whether the claims are time barred. *See*

## F. The Indimi Commissions Were Not Regular Commissions As Defined By the Ex–Im Supplier's Certificates

The parties disagree on whether the Indimi commissions were "regular commissions" within the meaning of the law.[6] At the time of the Nigerian sales brokered by Indimi from 1992–1994, Ex–Im required an exporter to certify that it had made no "discount, allowance, rebate, commission, fee or other payment" in connection with the Ex–Im financed sale other than "[r]egular commissions or fees paid or to be paid in the ordinary course of business to our regular sales agents or sales representatives and readily identifiable on our books and records as to amount, purpose and receipt." Gov't's Mot. for Partial Summ. J., Ex. 6 ("Letter of Credit Supplier's Certificates").

The defendants note that Indimi had a 12–year relationship with MWI going back to 1980, during which MWI had consistently paid him commissions of 30–40%. Defs.' Mot. for Summ. J. at 8. His commissions were paid in the ordinary course of MWI's business and were readily identifiable on MWI's books and records as to amount, purpose and receipt. Id. at 10. And no written "regulation, rule, or published standard" specifically defining "regular commission," "regular sales agent" or "ordinary course of business" contradicts the defendants' interpretation. Id. at 11. Indeed, the defendants allege that Ex–Im had no specific range of acceptable commissions, id. at 13, and "left it up to the exporter to determine if it was paying its sales agent a 'regular commission,'" id. at 15.

The government responds that, in absolute terms, the commissions in question dwarfed previous commissions paid to Indimi by more than 400%. Gov't's Opp'n at 8. The government proposes that "regular commissions" means "those commissions that are normally and typically paid to sales agents across the industry." Id. at 9. The term "regular sales agents" qualifies the term "regular commissions" such that, the government claims, a fair reader cannot narrowly construe the latter term as referring exclusively to the history of commissions paid to a particular sales agent. Id. at 9. To do so would drain the term "regular commissions" of all independent meaning or render the term "regular sales agent" surplusage. Id. The government also worries that the defendants' crabbed reading would conflict with Ex–Im's mission of fostering transparent, above-board U.S. exports because "[i]f an exporter were required to disclose a commission only if it exceeded what had previously been paid to the same agent, then [it] might not learn of a tainted commission if the prior commissions paid to the agent were similarly tainted." Id. at 10. Indeed, pertinent officials have "uniformly testified" that Ex–Im required "disclosure of any commission that exceeded what was normal practice in the industry." Id. at 15.

Nor, the government observes, would the defendants' representation that Indimi's commissions reflected "challenges in Nigeria includ[ing] (among other things) constant changes in federal and state governments ... currency fluctuations, and other factors," Defs.' Mot. for Summ. J. at 30, excuse the omission of the commissions

---

*generally* Def. Eller's Mem. (Oct. 12, 2007) and Gov't's Reply to Mem. (Oct. 15, 2007).

**6.** The defendants do not contest that the government has satisfied the three elements of a FCA claim aside from "intent" and "falsity";

namely, the existence of a claim; its presentment to the government; and its materiality. *See generally* Defs.' Opp'n to Gov't's Mot. for Partial Summ. J ("Defs.' Opp'n").

from the supplier's certificate. Gov't's Mot. for Partial Summ. J. at 22. To the contrary, such "unique difficulties" only "underscore[ ] the fact that [Indimi's commission] was not a regular commission and should have been disclosed." *Id.* at 22. For these reasons—in conjunction with the defendant's alleged failure to disclose the Indimi commissions on separate Nigerian export control forms, the testimony of former MWI employees that MWI was concerned that its omission of the Indimi commissions was illegal and the defendants' failure to inquire as to the proper meaning of "regular commissions"—the government asserts that it has proven every element of its FCA claims aside from intent. *Id.* at 24.

The defendants reply that the government's proposed standard is only its most recent in a long line of *post hoc* justifications entitled to no legal force. Defs.' Opp'n to Gov't's Mot. for Partial Summ. J. at 23; Defs.' Reply to Gov't's Opp'n to Defs.' Mot. for Summ. J. at 2–6. Moreover, Ex–Im has previously disavowed any interest in regulating the absolute amount of a commission. *Id.* at 6, Hess Dep. at 202 (App. 124). Finally, the defendants insist that, even if their construction of the certificates is in error, they had no duty to inquire as to its meaning, as the defendants believed they had interpreted the certificates correctly; Ex–Im never indicated that the defendants should re-examine their reporting practices and Ex–Im could not have clarified the requirements even had MWI inquired about them because Ex–Im itself had no definitive standard at that time. *Id.* at 18–19.

### 1. The Term "Regular Commissions" Is Not Impermissibly Vague

██ When a court wades into administrative law, its chief task is simply to apply the proper standard of judicial review. *See Wilson v. Commodity Futures Trad-*

*ing Comm'n,* 322 F.3d 555, 559 (8th Cir. 2003) (observing that determining the proper degree of deference "depends on the comparative qualifications and competencies of courts and agencies"). The initial step, therefore, is to characterize the subject of the agency's interpretation, the supplier's certificate. The certificate itself serves a procedural purpose, allowing Ex–Im to further its goal of financing U.S. exports by ensuring that sales are not tainted by irregular commissions that indicate bribery or a misappropriation of agency resources. *See, e.g., Fla. Cellular Mobil Commc'ns Corp. v. FCC,* 28 F.3d 191, 193 (D.C.Cir.1994) (upholding FCC's strict procedural rule of denying applications for licenses for cellular communications systems to companies in violation of eligibility criteria). The Supreme Court has declared that the law is "absolutely clear" that "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 543–44, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (quoting *FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965)). The requirement that an applicant divulge any payment that was not a "regular commission" clearly furthered Ex–Im's statutory purposes. *See* 12 U.S.C. § 635(f) (granting Ex–Im power to deny application based on fraud or corruption).

██ When deciding what constitutes a "regular commission," however, Ex–Im officials apparently relied on their implicit understanding of the term while refraining from helpfully issuing any written clarification. *See* Gov't's Opp'n at 16–17. Thus, the contours of Ex–Im's interpretation remained unclear until the parties deposed Ex–Im officials and related their findings

to the court in the instant motions. *Id.* The question arises, then, whether a federal court may accept an agency's interpretation set forth for the first time in a brief before the court. *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 589 (D.C.Cir.1997). Absent "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question" and is in fact a "*post hoc* rationalization," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), a court will accept an agency's litigation–fresh interpretation. *Auer v. Robbins*, 519 U.S. 452, 462–63, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

The defendants have provided no reason to doubt Ex–Im's representation that, as a policy decision, it settled the burden of compliance on exporters in the first instance to screen their own payments for irregular commissions, reserving to itself the function of ultimately determining whether the commissions were improper. *See* Gov't's Opp'n at 17, Ex. 5, ("Newton Dep.") at 128, Ex. 3 ("Hess Dep.") at 32, Ex. 7 ("Rodriguez Dep.") at 190–96 (citing deposition testimony of Ex–Im officials stating that, while Ex–Im had no fixed range of "regular commissions," it used an industry-wide standard). The defendants do, however, suggest that the Ex–Im's disclosure requirement is, in light of the agency's failure to issue a clarification, impermissibly vague—a concern that the court now examines.

 A court will not vary its posture of review simply because a regulation is ambiguous. *Paralyzed Veterans of Am.*, 117 F.3d at 584–85. But it must assure itself that a regulation is not impermissible vague by asking "whether the regulation 'delineated its reach in words of common understanding.'" *Vandehoef v. Nat'l Transp. Safety Bd.*, 850 F.2d 629, 630

(10th Cir.1988) (quoting *Brennan v. Occupational Safety and Health Review Comm'n*, 505 F.2d 869, 872 (10th Cir. 1974)). When examining a regulation, "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952). "Greater leeway" is afforded to regulations governing business activities than to those implicating the First Amendment. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). And it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines, Inc.*, 342 U.S. at 340, 72 S.Ct. 329.

 Under these standards, the court concludes the regulation here is sufficiently clear to put exporters on notice of the type of commissions required to be disclosed. The defendants do not dispute that MWI officials were concerned over the omission of Indimi's commissions. Gov't's Opp'n at 24, Ex. 11 ("Stair Dep.") at 89–90, Ex. 12 ("Ponce Dep.") at 144–45. In percentage terms, the Indimi commissions were substantially higher than MWI's prevailing commissions for its other agents. Roegiers Dep. at 11–12. In absolute terms, the Nigerian sales comprised the bulk of MWI's revenue from 1992–1994. Gov't's Opp'n at 3, Ex. 9 ("Hess Decl.") ¶ 3. The court would be surprised if the defendants had not paused when considering whether to disclose the commission.

From an objective standpoint, a reasonable person considering the term "regular commissions" would recognize that it might imply an industry-wide rather than an intra-firm or (as the defendants quite implausibly propose) an individual-agent standard. *See Paralyzed Veterans of*

*America,* 117 F.3d at 585 (endorsing an undemanding inquiry into whether a regulation "could be interpreted" or "might imply" the agency's adopted meaning). The term potentially includes all three. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 41, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (Kennedy, J. concurring) (recognizing that "[t]he law encompasses standards phrased at varying levels of generality"); *see also Nat'l Ass'n of Mfrs. v. Occupational Safety & Health Admin.,* 485 F.3d 1201, 1205 (D.C.Cir.2007) (affording agencies "broad deference" when "choosing the level of generality at which to articulate rules").

For the defendants to represent that the best they could manage was to throw up their hands in vacant bewilderment at the term "regular commissions" is beyond belief, especially as they serendipitously settled upon the narrowest definition possible in interpreting the term. *Vandehoef,* 850 F.2d at 630. It may be conceded that the term "regular commissions" is not susceptible to an exact definition; a nimbus of uncertainty may linger around commissions that lie at the fringes of industry-wide benchmarks. But this only reinforces the conclusion that the defendants should have assumed the featherweight onus of disclosing any questionable commissions and not, in lieu thereof, drawn an imaginary line in the sand inside which to claim immunity. *Boyce Motor Lines, Inc.,* 342 U.S. at 340, 72 S.Ct. 329. In sum, no credible objections prevent review of Ex–Im's proffered interpretation, a task the court now undertakes.

## 2. Ex–Im's Interpretation of "Regular Commission" Is Persuasive and Deserves Deference

Federal courts hesitate to second-guess an agency's interpretation of its own regulation and in fact will sustain it unless "plainly erroneous or inconsistent" with the regulation. *E.g., Paralyzed Veterans of Am.,* 117 F.3d at 584; *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). This deference even exceeds that granted an agency interpretation of a statute it is entrusted to administer. *E.g., Capital Network Sys., Inc. v. FCC,* 28 F.3d 201, 206 (D.C.Cir.1994).

Ex–Im's interpretation of "regular commissions" as referring to industry-wide benchmarks is not only "consistent" with the underlying term but is finely attuned to its context and purpose. Hess Decl. at ¶¶ 13–18 (identifying interests including avoiding inflated commissions that increase risk of default; ensuring the borrower's economy is not harmed by excessive commissions; combating the culture of bribery; and maximizing scarce agency resources). The disclosure requirement exempts "regular commissions" paid to "regular sales agents." The operative adjective is "regular" not "historical." Interpretation hinges as much on words not chosen as words chosen. *Pauley v. Beth-Energy Mines, Inc.,* 501 U.S. 680, 719, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (holding that, absent "absurd results," the hoary canon of construction *expressio unius est exclusio alterius* is a "strong indication" of meaning of disputed text). Ex–Im chose capacious language to lay a broad sieve over the application process, in which responsibility for filtering out improper commissions would fall in the first instance to exporters. It is Ex–Im's prerogative to establish procedures for effectuating its policies, which included ridding taxpayer-financed loans of tainted commissions, with all the maleficent effects attendant thereto. *Vt. Yankee Nuclear Power Corp.,* 435 U.S. at 543–44, 98 S.Ct. 1197. The defendants walked the line. They cannot now cry

unfairness at the consequences of their incaution. *Boyce Motor Lines, Inc.*, 342 U.S. at 340, 72 S.Ct. 329. The court affirms Ex–Im's ascription of an industry-wide frame of reference to the term "regular commission."

### G. The Repayment of the Loans in Full Does Not Nullify the Government's Damages

The defendants also claim that because Nigeria repaid the loans in full, the government incurred no damages and, therefore, may only claim statutory penalties. Defs.' Mot. for Summ. J. at 37–38. The government responds that the defendants may be entitled to a credit equal to the amount that the United States has recouped, but only after the government's damages are trebled. Gov't's Opp'n at 40–41. The defendants reply that the government is confusing compensatory payments (which the court subtracts after damages have been tripled) with actual damages (which the court measures as the value of the bargained for exchange). Defs.' Reply at 23–24.

■ Under the FCA, the government is entitled to "3 times the amount of damages which [it] sustains because of [the acts of the defendant who violated the FCA]." 31 U.S.C. § 3729(a). Causation linking the false statements and the government's damages exists where the false statements are "critical to eligibility for a loan" or where they "[bear] upon the likelihood of the applicant's meeting mortgage payments." *United States v. Hill*, 676 F.Supp. 1158, 1181 (N.D.Fla.1987) (quoting *United States v. Hibbs*, 568 F.2d 347, 352 (3d Cir.1977)). Ultimately, damages are measured based on "what the government would have paid out had it known of the information that [the defendant] omitted." *United States v. TDC Mgmt. Corp., Inc.*, 288 F.3d 421, 428 (D.C.Cir.2002).

The defendants direct the court's attention to the case of *Ab–Tech Construction, Inc. v. United States*, in which a government contractor for a data processing facility violated eligibility criteria in its subcontracting work, misrepresenting that public funds were being expended to assist minority-owned enterprises. 31 Fed.Cl. 429, 434 (Fed.Cl.1994). The government sought as damages the entire amount it had paid Ab–Tech for the data processor, but the court denied this relief, finding that the government had offered "[n]o proof ... to show that [it] suffered any detriment to its contract interest because of Ab–Tech's falsehoods. Rather, the [g]overnment got essentially what it paid for." *Id.*

As an initial consideration, the court notes that *Ab–Tech* constitutes persuasive rather than controlling precedent. Superior precedent instructs that causation is met where false statements are critical to eligibility for a loan or bear upon the likelihood of an applicant's meeting loan payments. *Hibbs*, 568 F.2d at 352. When these conditions are present, it is likely that the entire amount of federal funds expended on a program would not have been spent. *United States v. Inc. Vill. of Island Park*, 888 F.Supp. 419, 443 (E.D.N.Y.1995); *U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 200 (D.C.Cir.1995) (adopting proximate causation standard for actual damages in FCA cases, under which "the submitter of a false claim should be liable only for those damages that arise because of the falsity of the claim, i.e., only for those damages that would not have come about if the defendant's misrepresentations had been true").

■ The defendants do not contest that compliance with Ex–Im's supplier's certificates was critical to eligibility for Ex–Im financing or that the payment of

unnecessarily large commissions could bear upon the likelihood of a beneficiary repaying the loan in full. This alone renders the defendants liable for the full loan amount. In fact, the court need not distinguish *Ab–Tech* to reach this conclusion—because here the government did not "get essentially what it paid for." *Ab–Tech,* 31 Fed.Cl. at 434. Congress did not create the Ex–Im Bank merely in pursuit of the questionable mercantilist trading objective of inflating U.S. exports. *See generally* 12 U.S.C. § 635 (setting objective of "facilitat[ing] ... exchange of commodities and services," while giving due consideration to other factors including communist affiliation, drug trafficking, small business and agriculture promotion and third-world development). If it had, then the defendants would possibly be correct that the government suffered no detriment to its contract interest: one U.S. export is as good as another if the only consideration is dollars-and-cents. But Ex–Im's mission includes ensuring that government-sponsored export loans advance an international trading regime based on transparency, accountability and corruption-free economic exchange. *See generally* 12 U.S.C. § 635(a)(9) (charging Ex–Im with working closely with African banks and agencies pursuing strategy of African development); 12 U.S.C. § 635(f) (granting Ex–Im power to deny application based on fraud or corruption).

Moreover, the subversion of Ex–Im's mission is hardly the only injury the government has established. Although Nigeria has repaid the loans at issue here, it has not repaid other Ex–Im loans totaling over $973 million, $618 million of which were eventually forgiven. Gov't's Opp'n at 43. Thus, measured by their opportunity cost, the Nigerian loans are a substantial loss to the government. The math may be tricky, but the case law is simple: fraudulently induced government loans (even if eventually repaid in full) are part of the original loss to the government. *E.g., United States v. Bornstein,* 423 U.S. 303, 316, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (affirming analysis in *United States v. Globe Remodeling Co.,* 196 F.Supp. 652 (D.Vt.1960) (reasoning that "if repayments were subtracted before doubling the original losses, the double damage provision would be rendered a nullity in instances where the government has fully succeeded in its efforts to secure repayments")); *United States v. Ekelman & Assocs., Inc.,* 532 F.2d 545, 550 (6th Cir.1976) (including defendant's offsets to mortgage payments made by government in calculation of actual damages); *Hill,* 676 F.Supp. at 1182 (same); *United States v. Heck,* 1987 WL 49253, at *6 (D.N.J. Mar.26, 1987) (same).

To rule otherwise would be to affirm a distinction without a difference. For example, the government is entitled to actual damages when, acting as a guarantor, it satisfies a loan on which a third party defaults, even if the third party eventually repays the government in full. *E.g., Globe Remodeling Co.,* 196 F.Supp. at 652 (requiring FCA violator to pay damages that included loan sum that the government satisfied, even though the third party in default eventually reimbursed the government). But, pursuant to the defendants' argument, the government would not be so entitled and could seek only statutory penalties when, acting as the loan financier in the first instance, it issues a loan that a third party ultimately repays. Here, Ex–Im did not bargain for and receive as consideration the mere privilege of financing an export sale of dubious commercial integrity. *Cf. Ab–Tech,* 31 Fed.Cl. at 434 (denying actual damages to government because doing otherwise would constitute award of restitution that would require the government to return data processor facility). Ex–Im's benefit of the bargain was

inextricably intertwined with the fulfillment of the terms and representations (such as the disclosure certificate) of the bargain. Because that is what the defendants denied to Ex–Im, damages are appropriate.

## H. The Common Law Claims Against MWI Are Not Otherwise Deficient

In cursory fashion, the defendants also propose that the unjust enrichment claim fails because the government has not demonstrated "inequitable circumstances." Defs.' Reply at 25. The government responds that the Nigerian sales included a 100% mark-up in the prices of the equipment charged. Gov't's Opp'n at 50. The defendants reply that a mark-up does not demonstrate inequity. Defs.' Mot. for Summ. J. at 25. Moreover, the defendants object, the existence of a sales contract precludes a claim of unjust enrichment or payment by mistake. *Id.*

■■■ The defendants forget that it is commonplace for common law and FCA claims to proceed in tandem. *See U.S. ex rel. Miller,* 505 F.Supp.2d at 23–24 (citing *United States v. United Techs. Corp.,* 255 F.Supp.2d 779, 785 (S.D.Ohio 2003) (explaining that common law and FCA claims may proceed together because, while the government "will not be allowed to recover twice, [it] may defer its election of remedy until trial on the merits")). Indeed, the claims for unjust enrichment and payment under mistake of fact essentially duplicate each other, seeking relief identical to that awarded in an FCA case. *Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision,* 59 F.3d 212, 217 (D.C.Cir. 1995) (noting that "the fundamental characteristic of unjust enrichment is 'that the defendant has been unjustly enriched by receiving something ... that properly belongs to the plaintiff[, thereby] forcing restoration to the plaintiff' ") (quoting DOBBS, LAW OF REMEDIES § 4.1(2)).

With that symmetry in mind, it takes no particular perspicacity to recognize that "[t]he entire purpose of bringing an FCA claim against defendants by itself establishes the third element of unjustness." *Miller v. Holzmann,* 2007 WL 710134, at *7 (D.D.C. Mar.6, 2007). As for the proposition that an allegation of an express contract precludes the raising of equitable common law claims, the court does not necessarily disagree, but it has already ruled that the defendants neglected to raise this argument during motion-to-dismiss proceedings. *U.S. ex rel. Purcell v. MWI Corp.,* 254 F.Supp.2d 69, 79 (D.D.C. 2003). Because the case has now progressed to summary judgment, mere allegations of a contract between MWI and Ex–Im will not carry the day.[7] *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. And while the parties undoubtedly exchanged guarantees and certificates regarding the particulars of the Nigerian projects, the court is indisposed to construing these as explicit contracts for the purposes the defendants propose. *Muniz v. GCA Servs. Group, Inc.,* 2006 WL 2130735, at *9 (M.D.Fla. July 28, 2006) (considering, for purposes of disposing of equity claim, only a valid contract that can be said to cover the subject matter of compensation); 12 WILLSTON ON CONTRACTS, § 1479, 276–77 (3d ed.) (explaining that equitable doctrine arose to enforce legal duties where no formal contract exists). The court, there-

---

7. In fact, the defendants have offered no evidence of any contract between Ex–Im and MWI. The defendants have confirmed that MWI made eight separate Ex–Im–financed sales to seven different Nigerian States. Defs.' Mot. for Summ. J. at 2. But the defendants have not alleged that, vis-a-vis Ex–Im, MWI did anything beyond "complete numerous forms and applications in connection with EXIM's financing." *Id.* at 3.

fore, will not dismiss the common law claims against MWI.

## IV. CONCLUSION

For the foregoing reasons, the court grants the plaintiff's motion to file a sur-reply, grants defendant Eller's motion for summary judgment, denies the defendants' joint motion for summary judgment and grants in part the plaintiff's cross-motion for partial summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 6th day of November, 2007.