# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 17, 2015　　　Decided November 24, 2015

No. 14-5210

UNITED STATES OF AMERICA EX REL. ROBERT R. PURCELL,
APPELLANT/CROSS-APPELLEE

ROBERT R. PURCELL,
CROSS-APPELLEE

v.

MWI CORPORATION,
APPELLEE/CROSS-APPELLANT

Consolidated with 14-5218

Appeals from the United States District Court
for the District of Columbia
(No. 1:98-cv-02088)

*Melissa N. Patterson*, Attorney, U.S. Department of Justice, argued the cause for appellant/cross-appellee United States of America. With her on the briefs were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent H. Cohen, Jr.*, Acting U.S. Attorney, and *Michael S. Raab*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Brian Tully McLaughlin* and *Robert T. Rhoad* argued the causes for appellee/cross-appellant MWI Corporation. With them on the brief were *Charlotte E. Gillingham* and *Jason C. Lynch*.

*Joseph J. Aronica* argued the cause and filed the brief for cross-appellee Robert R. Purcell.

*Douglas W. Baruch* and *Jennifer M. Wollenberg* were on the brief for *amicus curiae* National Association of Manufacturers in support of defendant-appellee/cross-appellant in support of reversal of the decisions finding liability under the False Claims Act.

Before: ROGERS, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The United States successfully brought a civil action pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, based on certifications by MWI Corp. to the Export-Import Bank ("the Bank") to secure loans financing MWI's sale of water pumps to Nigeria. Although the total loan of $74.3 million was to Nigeria, the Bank required MWI to certify that it had paid only "regular commissions" to the sales agent responsible for the sales contract. A jury found the certifications were false and awarded the government $7.5 million in damages. The damages were trebled to $22.5 million pursuant to the FCA. Because an FCA defendant is entitled to an offset from the trebled damages by any amount paid to compensate the government for the harm caused by the false claims, *see United States v. Bornstein*, 423 U.S. 303 (1976), and the district court considered Nigeria's repayment of the loan to be compensatory, MWI's damages were reduced from $22.5 million to $0. MWI thus was subject only to civil penalties,

which the district court imposed at the highest level permitted by the statute, $10,000 for each of the 58 certifications.

The government, having recovered no damages, appeals. It contends the district court should have applied only $7.5 million of Nigeria's loan repayment as an offset against MWI's $22.5 million in trebled damages, because, according to the government, the offset applies against the amount of damages before trebling, not against the trebled damages, and so it is still entitled to recover $15 million in damages. MWI cross appeals on the principal ground that the government failed as a matter of law to establish that it made a false claim or that it had done so knowingly, both of which are required to establish FCA liability.

Because the government failed to establish that MWI knowingly made a false claim, we reverse. At the time MWI made the certifications, the government had yet to inform exporters that, contrary to MWI's understanding of "regular commissions," the term refers to what is normally paid in the industry, and not what an exporter had historically paid to an individual sales agent. Absent evidence that the Bank, or other government entity, had officially warned MWI away from its otherwise facially reasonable interpretation of that undefined and ambiguous term, the FCA's objective knowledge standard, as the Supreme Court clarified while this litigation was pending in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69–70 & n.20 (2007), did not permit a jury to find that MWI "knowingly" made a false claim.

## I.

The following facts are undisputed. In 1992, MWI agreed to sell $82.2 million in irrigation pumps and related equipment to seven states in Nigeria. To facilitate the sales, the parties sought financing from the Bank, which finances and facilitates

export of U.S. goods and services by providing loans to foreign purchasers, thereby "contribut[ing] to the employment of United States workers." 12 U.S.C. § 635(a)(1). The Bank agreed to lend Nigeria $74.3 million in eight separate loans. Prior to approving the loans, the Bank had required MWI to submit a "Letter of Credit Supplier's Certificate" in which MWI certified that it had not paid "any discount, allowance, rebate, commission, fee or other payment in connection with the sale" except "*[r]egular commissions* or fees paid or to be paid in the ordinary course of business to [its] regular sales agents." (Emphasis added). Similarly, before it would disburse funds, the Bank required MWI to make an identical certification. Altogether, MWI certified in fifty-eight documents that it had paid only "regular commissions" in connection with the water pump sales.

In 1998, a former MWI employee, Robert Purcell, filed on behalf of the government the FCA complaint on which this lawsuit is based. Purcell, relator here, alleged that non-regular commissions had been paid, pointing to $28 million in commissions — over 30% of the loan amount — that MWI had paid to its long-term (over twelve years) Nigerian sales agent, Alhaji Indimi. He alleged those commissions were so great that MWI should have disclosed them to the Bank as payments other than "regular commissions."

In 2002, the United States intervened and filed an amended complaint stating two FCA claims and two common law claims. *See* 31 U.S.C. § 3730(b)(2). (The common law claims were subsequently dropped.) Focusing on the unreported commissions, the government alleged that MWI both knowingly submitted false claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and knowingly made false statements to obtain a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(2). The parties filed cross motions for summary

judgment.

The district court denied MWI's motion and granted the government's motion in part. *United States ex rel. Purcell v. MWI Corp.* (*MWI I*), 520 F. Supp. 2d 158, 181 (D.D.C. 2007). MWI argued that the unsettled meaning of the ambiguous term "regular commissions" precluded, as a matter of law, the government from establishing the elements of falsity and knowledge. The district court acknowledged that the Bank had not issued written guidance on the meaning of the term and that "the contours of [the Bank's] interpretation remained unclear until the parties deposed [Bank] officials and related their findings to the court in the instant motions." *Id.* at 175–76. Further, it agreed that the undefined, ambiguous term could support MWI's understanding that a commission is "regular" if it is consistent with what had historically been paid to an individual agent. *Id.* at 175–77. Nonetheless, the district court accepted the meaning the government proposed in its summary judgment briefing: a commission is "regular" only if it is consistent with industry-wide benchmarks. *Id.* at 175–78. This definition was based on the implicit understanding Bank employees had about the meaning of the term. In view of the amount of the commissions at issue, the district court concluded that the term "regular commissions" was not so ambiguous that MWI had not been on notice that, in the government's view, the term "might imply an industry-wide rather than an intra-firm or (as the defendants quite implausibly propose) an individual-agent standard." *Id.* at 176. To the extent that there was a "nimbus of uncertainty" that "may linger around commissions that lie at the fringes of industry-wide benchmarks," the district court suggested that MWI ought to have "assumed the featherweight onus of disclosing any questionable commissions." *Id.* at 177.

Having accepted the government's definition for "regular commissions," the district court left to the jury the question

whether MWI knowingly made a false claim. *See id.* at 177–78, 181. In a later round of summary judgment, the district court determined that the government had proffered sufficient evidence to create triable issues as to whether MWI's claims were false as measured against this industry-wide definition of "regular commissions," whether such claims were material, and whether the government had suffered any actual damages as a result of the false claims. *United States ex rel. Purcell v. MWI Corp.* (*MWI II*), 824 F. Supp. 2d 12, 26–30 (D.D.C. 2011). During this round, the government expanded on its interpretation of the industry benchmark relevant to determining regularity, arguing that the commissions paid to Indimi were so high that they would be considered irregular in any industry. Even so, the government offered evidence that the commissions paid to Indimi would be considered irregular in MWI's industry, which the government defined as the "business of manufacturing and selling pumps and related equipment." *Id.* at 26–27 & n.6. The government resisted MWI's argument that in determining whether commissions were regular it was appropriate to take into account the country in which the work giving rise to the commissions was to be completed.

Because the parties disputed whether MWI's commissions complied with this industry-wide standard, the district court denied both motions for summary judgment on the falsity issue, stating that "a jury is more than capable of resolving any borderline definitional issues" presented by the need to apply an industry-wide standard. *Id.* at 27 & n.6. The district court also rejected MWI's argument that Purcell must be dismissed from the lawsuit, finding his allegations of fraud had not been based on information solely found in the public domain — either from news articles speaking generally about potential fraud associated with the MWI-Nigeria deal or any related Freedom of Information Act requests. *Id.* at 22–24; *see* 31 U.S.C. § 3730(e)(4).

A jury found each of MWI's fifty-eight certifications violated the FCA under §§ 3729(a)(1) & (2), and that the government suffered $7.5 million in actual damages. The district court trebled this amount to $22.5 million pursuant to the FCA, 31 U.S.C. § 3729(a), but accepted MWI's argument that the entirety should be offset because Nigeria's repayments of $108 million (the full loan with interest and fees) constituted compensatory payments. *United States ex rel. Purcell v. MWI Corp.* (*MWI III*), 15 F. Supp. 3d 18, 23, 30 (D.D.C. 2014). The district court relied on *Bornstein*, 423 U.S. at 314–17, in which the Supreme Court held that an FCA defendant is entitled to an offset from the trebled damages by any amount paid to compensate the government for harm caused by the false claims. MWI was not completely off the hook, however, because the district court imposed the maximum ($10,000) in civil penalties for each of the fifty-eight false claims. *MWI III*, 15 F. Supp. 3d at 32; *see* 31 U.S.C. § 3729(a). The district court denied MWI's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), finding there was sufficient evidence for a jury to find the Indimi commissions were not regular and to infer knowledge of falsity. *United States ex rel. Purcell v. MWI Corp.* (*MWI IV*), 50 F. Supp. 3d 33, 39–46 (D.D.C. 2014). Concluding that it lacked authority to consider whether MWI's good faith or reasonable understanding of "regular commissions" precluded a knowledge finding, because MWI had an opportunity to argue that theory to the jury, *see id.* at 44–46, the district court found no basis to overturn the jury's determination that MWI did not have a reasonable or good faith interpretation of "regular commissions," *id.* at 46.

Both the government and MWI appeal. The government contends that the district court erred in not confining the offset to the non-trebled portion of the damages award — $7.5 million — and that it is entitled to recover $15 million in damages. MWI, on cross appeal, contends that the district court erred in

denying its motions for summary judgment and judgment as a matter of law. MWI maintains it could not have been found liable under the FCA because it was entitled to rely on its own reasonable interpretation of "regular commissions" absent timely notice from the government of the meaning of that undefined and ambiguous term. MWI also challenges the district court's ruling that Purcell's claims were not jurisdictionally barred under 31 U.S.C. § 3730(e)(4)(A). In view of our disposition of MWI's cross appeal, the court need not address the government's offset contention. The court also need not address MWI's contention that Purcell's claim is jurisdictionally barred; the court would have jurisdiction even if Purcell is dismissed as relator in this lawsuit, *see Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476–78 (2007), and the presence of Purcell in the lawsuit makes no material difference to our consideration of the merits of these appeals, *see Military Toxics Project v. Envtl. Prot. Agency*, 146 F.3d 948, 954 (D.C. Cir. 1998); *Aamer v. Obama*, 742 F.3d 1023, 1042–43 (D.C. Cir. 2014).

## II.

The False Claims Act prohibits false or fraudulent claims for payment from the United States. 31 U.S.C. § 3729(a); *see United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 835 (D.C. Cir. 2012). The government alleged that MWI violated that prohibition in two separate but related ways: (1) it knowingly presented false claims, 31 U.S.C. § 3729(a)(1), and (2) it used false statements to get false claims paid, *id.* § 3729(a)(2).[1] Under either theory, the government had to prove

---

[1] Congress modified and renumbered 31 U.S.C. § 3729(a) upon enactment of The Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617. The government advises that only the amendment to § 3729(a)(2) was made retroactive, but states the amendments are not relevant to this appeal and cites only the pre-2009

"that the defendant presented . . . a claim to the government, that the claim was false, and that the defendant knew that the claim was false." *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015) (quoting *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003)). The jury found that the government had established liability and damages under both FCA theories.

Focusing on the ambiguity resulting from the government's failure to provide guidance to exporters about the meaning of the term "regular commissions," MWI contends that these FCA claims should have never gone to the jury. First, MWI maintains its reasonable interpretation of the undefined, ambiguous term prevented a jury from finding either the elements of falsity or knowledge under the FCA. Second, MWI maintains this ambiguity means that the district court erred as a matter of law in concluding that MWI had fair notice of its legal obligations when the term could, as the district court found, plausibly have implied MWI's interpretation.

Of course, the government as plaintiff has the burden of proving each element of the FCA, and to prevail, MWI need only show that the government's proof was lacking as to any one element. Contentions like these — that a defendant cannot be held liable for failing to comply with an ambiguous term — go to whether the government proved knowledge. *See United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463–64 (9th Cir. 1999). And in this context, resolving the knowledge issue makes resolving the notice question unnecessary. Strict enforcement of the FCA's

---

version of the statute in its brief. Appellant's Br. 2 n.1. This opinion refers only to the FCA's pre-2009 text. *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010).

knowledge requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability, thereby avoiding the potential due process problems posed by "penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broad. Co. v. Fed. Commc'ns Comm'n*, 824 F.2d 1, 3 (D.C. Cir. 1987). There is no doubt that MWI has been penalized; in addition to damages, the FCA imposes statutory penalties on those defendants who fail to comply with its terms. *See* 31 U.S.C. § 3729(a). And it is undisputed that the first actual notice of the meaning of "regular commissions" did not come until long after the conduct giving rise to this litigation took place. Faced with concerns like these, a knowledge requirement can play an essential role as it "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

To be liable under the FCA, a defendant must have made the false claims knowingly. *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 29 (D.C. Cir. 2014)*; K & R Ltd.*, 530 F.3d at 983. An entity acts knowingly under the FCA by "(1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." *Folliard*, 764 F.3d at 29. Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. *See Oliver*, 195 F.3d at 463–64. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations. *See K & R Ltd.*, 530 F.3d at 983–84; *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190–91 (8th Cir. 2010); *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998); *cf. Safeco Ins.*, 551 U.S. at 69–70 & n.20. As this court has recognized, establishing "even the loosest

standard of knowledge, i.e., acting 'in reckless disregard of the truth or falsity of the information'" is difficult when falsity turns on a disputed interpretive question. *See United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) (quoting 31 U.S.C. § 3729(b)(3)).

MWI reads these precedents to mean that the knowledge element presents a pure question of law such that a defendant cannot be held liable under the FCA so long as it has an objectively reasonable interpretation of an ambiguous provision. If this understanding is correct, then the court could reverse in MWI's favor without considering the evidence presented to the jury on the question of knowledge. *Cf. Feld v. Feld*, 688 F.3d 779, 782 (D.C. Cir. 2012). The interpretive questions whether the term "regular commissions" is ambiguous and whether MWI's interpretation is objectively reasonable are legal questions. *See Oliver*, 195 F.3d at 463; *K & R Ltd.*, 530 F.3d at 983; *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011); *Feld*, 688 F.3d at 783. But this court, looking to Supreme Court guidance, has held that a jury might still find knowledge if there is interpretive guidance "that might have warned [the defendant] away from the view it took." *K & R Ltd.*, 530 F.3d at 983 (quoting *Safeco Ins.*, 551 U.S. at 70). In other words, even if the meaning of "regular commissions" is ambiguous and MWI's interpretation is reasonable, there remains the question whether MWI had been warned away from that interpretation. That question cannot readily be labeled as a "purely legal" question. *See Ortiz*, 562 U.S. at 190–91. Consequently, MWI cannot prevail on the basis that the issue of knowledge should never have gone to the jury because it was entitled to summary judgment on a pure question of law. Proving knowledge is in part an evidentiary question, and "once evidence is presented at a trial, any challenge to evidentiary sufficiency at summary judgment becomes moot." *Feld*, 688 F.3d at 782; *Ortiz*, 562 U.S. at 183–84; *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718–19 (7th Cir. 2003).

MWI must instead show that the evidence before the jury was not sufficient for it to find that MWI acted knowingly.

On the legal questions, we agree with MWI that the meaning of the term "regular commissions" is ambiguous and that MWI's interpretation is reasonable. No party contests that the meaning of "regular commissions" is ambiguous. As the district court found, the term could imply at least three different standards: industry-wide, intra-firm, or individual-agent. *MWI I*, 520 F. Supp. 2d at 176–77. So understood, MWI's individual-agent interpretation of "regular commissions" is objectively reasonable. Furthermore, the definition of "regular" makes clear that something can be "regular" either because it is not unusual in relation to societal norms or because it is not unusual for that individual. *See, e.g.*, *The American Heritage Dictionary of the English Language* (5th ed. online 2015). Consequently, MWI could reasonably have concluded that Indimi's commissions were regular because they were consistent with what MWI had been paying him for over twelve years and were calculated using the same formula MWI used to determine commissions for all of its agents. Moreover, even if "regular commissions" is best understood as referring to an industry-wide standard in light of the Bank's mission, which includes "ridding taxpayer-financed loans of tainted commissions," *MWI I*, 520 F. Supp. 2d at 177, that does not mean MWI's interpretation is objectively unreasonable. This knowledge inquiry is necessary only because MWI's understanding of the term proved to be "erroneous" once the government announced the term's meaning in this litigation. *See Safeco Ins.*, 551 U.S. at 69. Had the government interpreted the term as MWI does, there can be little doubt that the court would owe deference to that interpretation as reasonable. *See Satellite Broad.*, 824 F.2d at 3.

Accepting the reasonableness of MWI's interpretation, the factual question remains whether there was sufficient evidence

that MWI was warned away from its interpretation. The court will not overturn a jury verdict "unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree." *Williams v. Johnson*, 776 F.3d 865, 870 (D.C. Cir. 2015) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996)). MWI has met this demanding standard, for the government has not pointed to sufficient record evidence that there was "guidance from the courts of appeals" or relevant agency "that might have warned [MWI] away from the view it took." *Safeco Ins.*, 551 U.S. at 70; *K & R Ltd.*, 530 F.3d at 983. It is undisputed that the government has never published any written guidance on what the term meant. *MWI I*, 520 F. Supp. 2d at 175–76. The Bank first revealed its understanding of "regular commissions" only after this litigation began. Indeed, Bank officials acknowledged at trial that the Bank had preferred to keep the standard flexible in order to make the loan approval process more efficient, having moved away from an overly cumbersome system where exporters listed all expenses and commissions. *See* Tr. at 17–26 (testimony of Warren Glick) (Nov. 20, 2013, PM Session). And even though the Bank was concerned about bribery escaping its detection, it was wary of adopting a rigid standard for "regular commissions" in view of the wide variety of transactions the Bank financed. Tr. at 69–78 (testimony of Dr. Rita Rodriguez) (Nov. 14, 2013, AM Session). In keeping the standard flexible, however, the Bank (and the government) afforded exporters such as MWI the right to rely on its reasonable interpretation of that flexible standard until the Bank (or a court, Congress, or an appropriate agency) indicates otherwise.

Unable to establish that the Bank had made known its implicit understanding of "regular commissions," the government attempts to salvage the jury's knowledge finding by emphasizing other record evidence. First, the government

highlights that even though the Bank's standard was not formally published, there was, in the government's view, evidence that MWI had been warned away from its individual-agent understanding of "regular commissions." The government's best evidence on this point is testimony by a former MWI employee that the Bank, through its Nigeria country officer, had told MWI that even though there were no definitive guidelines for commissions, they should be somewhere near five percent. Tr. at 20–22 (testimony of Juan Ponce) (Nov. 13, 2013, AM Session). But this suggestion hardly amounts to the necessary "authoritative guidance" from the Bank. In *Safeco Insurance*, the Supreme Court explained that informal guidance like the kind described here — in that case an informal letter from staff of the Federal Trade Commission — is not enough to warn a regulated defendant away from an otherwise reasonable interpretation it adopted. *See id.* at 70 n.19.

Second, the government focuses on testimony by that same MWI employee that he and his fellow employees knew they were applying the wrong definition of "regular commissions" and had concerns about not disclosing Indimi's commissions in the certifications to the Bank. Tr. at 33–36 (testimony of Juan Ponce) (Nov. 13, 2013, AM Session). In the face of an undefined and ambiguous regulatory requirement, it is no wonder that employees of the regulated entity were concerned. More fundamentally, all this evidence might imply is that MWI did not hew to its reasonable interpretation in good faith. Since this litigation began, the Supreme Court clarified that subjective intent — including bad faith — is irrelevant when a defendant seeks to defeat a finding of knowledge based on its reasonable interpretation of a regulatory term. *See Safeco Ins.*, 551 U.S. at 70 n.20. Under the FCA's knowledge element, then, the court's focus is on the objective reasonableness of the defendant's interpretation of an ambiguous term and whether there is any evidence that the agency warned the defendant away from that

interpretation.  See *id.* at 70 & nn.19–20; *K & R Ltd.*, 530 F.3d at 983.

These generalized concerns about the regularity of Indimi's commissions also fail to support a finding that MWI acted recklessly by failing to seek a legal opinion from the Bank resolving MWI's concerns.  In *K & R Ltd.*, 530 F.3d at 983–84, the court rejected a similar argument, explaining that the defendant's "failure to obtain a legal opinion or prior [agency] approval cannot support a finding of recklessness without evidence of anything that might have given it reasons to do so." Although MWI may have been concerned generally, there is no evidence that the Bank gave it particular reason to formally inquire about these commissions.

The government's final evidentiary theory fares no better. It maintains that because the sheer amount of these commissions — both in absolute dollar amount and percentage terms — was so much greater than those paid elsewhere, MWI must have known that they were irregular.  As an initial matter, the record does not support that these commissions were so far out of sync with what is seen elsewhere in the world.  At oral argument, government counsel emphasized that the basis for this argument was testimony by a former Bank board member, Dr. Rita Rodriguez, that she had never seen commissions in any industry at the rate given to Indimi.  Tr. at 27–39, 79–86 (Nov. 14, 2013, AM Session).  On cross examination, however, Dr. Rodriguez acknowledged that the Bank pays its own insurance brokers commissions of up to forty percent.  *Id.* at 80–87.  Although Dr. Rodriguez suggested that the percentages paid by the Bank were likely this high only because the absolute dollar amounts were small, *id.* at 90, the state of the record is far from clear that the government established that Indimi's commissions were so innately irregular that MWI must have known the commissions should have been disclosed.

Even assuming the jury was convinced that these commissions were beyond the pale, the government's position that this establishes knowledge amounts to a backdoor challenge to whether MWI's interpretation was reasonable. The government's desire to avoid results like these — where the Bank may not have assessed whether a high commission represents the financing of non-U.S. employment or a bribe — might confirm that MWI's interpretation of "regular commissions" is incompatible with the Bank's basic purposes and the government's interpretation the better one. That MWI's interpretation may not be the best interpretation does not demonstrate that MWI's interpretation was necessarily unreasonable. Absent evidence that the negative consequences of an interpretation render it unreasonable, such consequences can play no role in evaluating whether an FCA defendant acted knowingly. *Cf. Safeco Ins.*, 551 U.S. at 70 n.20. Had the government wanted to avoid such consequences, it could have defined its regulatory term to preclude them. Of course, the government may instead determine that its goals are better served by not doing so, much as the Bank officials' testimony implied. This may be the government's choice, but then the FCA may cease to be an available remedy if the government concludes after the fact that a particular commission is not "regular" because it is too high.

Accordingly, we reverse and remand the case with instructions to enter judgment for MWI, and we do not address the damages question presented by the government's appeal or MWI's challenge to the denial of dismissal of relator Purcell.