**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1811

UNITED STATES OF AMERICA, and the State of North Carolina, California and Illinois, ex rel., SCARLETT LUTZ, Relator; CHRIS REIDEL; KAYLA WEBSTER, Relator; DR. MICHAEL MAYES, Relator,

Plaintiffs – Appellees,

v.

LATONYA MALLORY,

Defendant – Appellant,

and

HEALTH DIAGNOSTIC LABORATORY INC.; SINGULEX INC.; LABORATORY CORPORATION OF AMERICA HOLDINGS; BLUEWAVE HEALTHCARE CONSULTANTS, INC.; PHILIPPE J. GOIX, PhD; FLOYD CALHOUN DENT, III; ROBERT BRADFORD JOHNSON; BERKELEY HEARTLAB, INC.; QUEST DIAGNOSTICS, INCORPORATED,

Defendants.

No. 18-1812

UNITED STATES OF AMERICA, and the States of North Carolina, California and Illinois, ex rel., SCARLETT LUTZ, Relator; DR. MICHAEL MAYES, Relator; CHRIS RIEDEL; KAYLA WEBSTER, Relator,

Plaintiffs – Appellees,

v.

CHRISTINA M. DENT; LAKELIN PINES, LLC; TRINI "D" ISLAND, LLC,

Parties-in-Interest – Defendants,

and

LATONYA MALLORY; HEALTH DIAGNOSTIC LABORATORY INC.; LABORATORY CORPORATION OF AMERICA HOLDINGS; PHILIPPE J. GOIX, PhD; BERKELEY HEARTLAB, INC.; QUEST DIAGNOSTICS, INCORPORATED; SINGULEX INC.; BLUEWAVE HEALTHCARE CONSULTANTS, INC.; FLOYD CALHOUN DENT, III; ROBERT BRADFORD JOHNSON,

Defendants.

---

**No. 18-1813**

---

UNITED STATES OF AMERICA, and the State of North Carolina, California and Illinois, ex rel., SCARLETT LUTZ; KAYLA WEBSTER; CHRIS RIEDEL; DR. MICHAEL MAYES,

Plaintiffs – Appellees,

v.

ROBERT BRADFORD JOHNSON; FLOYD CALHOUN DENT, III; BLUEWAVE HEALTHCARE CONSULTANTS, INC.,

Defendants – Appellants,

AROC ENTERPRISES, LLC; BLUE EAGLE FARMING, LLC; CAE PROPERTIES, LLC; WAR-HORSE PROPERTIES, LLLP; EAGLE RAY INVESTMENTS, LLC; FORSE INVESTMENTS, LLC; ROYAL BLUE MEDICAL INCORPORATED; COBALT HEALTHCARE CONSULTANTS, INC.,

Parties-in-Interest – Appellants,

and

BERKELEY HEARTLAB, INC.; LATONYA MALLORY,

Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Beaufort. Richard Mark Gergel, District Judge. (9:11-cv-01593-RMG; 9:14-cv-00230-RMG; 9:15-cv-02485-RMG)

---

Argued: December 8, 2020                                      Decided: February 22, 2021

---

Before MOTZ, WYNN, and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Wynn and Judge Floyd joined.

---

**ARGUED:** William Walter Wilkins, NEXSEN PRUET, LLC, Greenville, South Carolina; Beattie Ashmore, BEATTIE B. ASHMORE, PA, Greenville, South Carolina; Nekki Shutt, BURNETTE SHUTT & MCDANIEL, PA, Columbia, South Carolina, for Defendants. Benjamin M. Shultz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Kirsten E. Small, NEXSEN PRUET, LLC, Greenville, South Carolina, for Defendants Floyd Calhoun Dent, III and Robert Bradford Johnson. Joseph P. Griffith, Jr., JOE GRIFFITH LAW FIRM, LLC, Mt. Pleasant, South Carolina, for Appellant Floyd Calhoun Dent, III. M. Dawes Cooke, Christopher M. Kovach, John W. Fletcher, BARNWELL WHALEY PATTERSON & HELMS, L.L.C., Charleston, South Carolina, for Defendants Floyd Calhoun Dent, III and Robert Bradford Johnson and Parties-in-Interest Blue Eagle Farming, LLC, Eagle Ray Investments, LLC, Forse Investments, LLC, War-Horse Properties, LLLP, Royal Blue Medical, Inc., AROC Enterprises, LLC, CAE Properties, LLC, and Cobalt Healthcare Consultants, Inc. Jacqueline M. Pavlicek, BURNETTE SHUTT & MCDANIEL, PA, Columbia, South Carolina, for Parties-in-Interest Christina Dent, Lakelin Pines LLC, and Trini "D" Island, LLC. Joseph H. Hunt, Assistant Attorney General, Charles W. Scarborough, Melissa N. Patterson, Benjamin M. Shultz, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Sherri A. Lydon, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellees.

---

DIANA GRIBBON MOTZ, Circuit Judge:

LaTonya Mallory, the owner of a blood testing laboratory, and the two men who led its sales operation, Floyd Calhoun Dent III and Robert Bradford Johnson (collectively, "Defendants"), appeal a jury verdict finding them liable for multiple violations of the False Claims Act, 31 U.S.C. § 3729. During a twelve-day trial, the Government presented evidence that Defendants violated the Act in several ways, including by paying physicians for drawing patients' blood and processing the blood samples in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Notwithstanding their vigorous protestations of innocence, the jury found that Defendants had indeed violated the False Claims Act and assessed actual damages in excess of $16 million. In a series of careful opinions, the district court denied their post-trial motions for judgment as a matter of law and for a new trial. After trebling the actual damages and adding civil penalties, as required by the False Claims Act, the district court entered judgment against all three Defendants for $111,109,655.30 and against Dent and Johnson for an additional $3,039,006.56. For the reasons that follow, we affirm the judgment of the district court in all respects.

I.

In 2008, Mallory founded Health Diagnostic Laboratory ("HDL"), which provided blood testing for cardiovascular disease and diabetes. One year later, Dent and Johnson formed BlueWave Healthcare Consultants, Inc., which entered into an exclusive contract with HDL to market and sell HDL's tests. In addition to a base fee, HDL agreed to pay BlueWave a percentage of its revenue based on the number of HDL blood tests that

4

physicians ordered. In 2010, BlueWave entered into a similar agreement with another lab, Singulex, which also provided blood testing for cardiovascular disease. This contract, too, permitted BlueWave to collect a base amount plus a sales commission based on the number of tests sold.

HDL agreed to pay BlueWave between 13.8 and 19.8 percent of the revenue it generated for HDL. Singulex agreed to pay BlueWave 24 percent of the revenue it generated for HDL. To fill out its sales force, BlueWave then contracted with other independent salespeople. Under these agreements, the salespeople also obtained commissions based on the volume of sales made.

HDL and Singulex used the same business model: in exchange for ordering one of their blood tests, the labs paid physicians a "process and handling fee" ("P&H fee"). According to Defendants, the P&H fee covered the costs physicians incurred when preserving a blood sample and shipping it to either HDL or Singulex. HDL paid physicians a $3 "draw fee" (compensation for drawing blood) plus a $17 P&H fee (compensation for handling and shipping the blood samples), for a total of $20. Singulex paid physicians $13 for drawing and processing the blood.

Between 2010 and June 2014, Medicare and TRICARE (the federal health care plan for members of the military) paid HDL approximately $538 million and HDL paid BlueWave approximately $220 million. Medicare and TRICARE paid Singulex approximately $47 million, and Singulex paid BlueWave approximately $24 million.

At trial, the Government contended that the volume-based commissions paid by HDL and Singulex to BlueWave and its sales contractors violated the Anti-Kickback

5

Statute because these commissions constituted "remuneration" intended to induce sales representatives to sell as many tests as possible. The Anti-Kickback Statute prohibits "knowingly and willfully" soliciting or receiving remuneration in exchange for "arranging for the furnishing" of a healthcare service and "recommending purchasing" a healthcare service. 42 U.S.C. § 1320a-7b(b)(1). It also prohibits "knowingly and willfully" paying remuneration to "induce" someone to take such actions. *Id*. § 1320a-7b(b)(2). The Government maintained that the statute thus prohibited HDL and Singulex from paying BlueWave for inducing others to arrange the tests. Similarly, the Government contended that the statute prohibited BlueWave from paying its salespeople for recommending purchase of the tests. The Government argued that since Defendants knowingly entered into agreements to pay independent contractors based on volume, they violated the Anti-Kickback Statute. Because that statute provides that a claim that violates its terms also "constitutes a false or fraudulent claim" under the False Claims Act, *id*. § 1320a-7b(g), the Government contended that this Anti-Kickback Statute violation also gave rise to liability under the False Claims Act. The jury agreed.

## II.

Defendants assert that the district court fundamentally erred in denying them judgment as a matter of law. *See* Fed. R. Civ. P. 50(b). We review the denial of a judgment as a matter of law *de novo*, but reverse only if substantial evidence does not support the jury's findings. *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). We

6

can set aside the verdict only if "no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

A.

Defendants initially and principally contend that the Government failed to prove that they "knowingly and willfully" violated the Anti-Kickback Statute, *see* 42 U.S.C. § 1320a-7b(b)(1), and so they cannot have "knowingly" run afoul of the False Claims Act. This argument rings hollow. The Government provided abundant evidence as to Defendants' knowledge and intent.

Attorneys from within both HDL and BlueWave warned Defendants that paying commissions to independent contractors might well violate the Anti-Kickback Statute.[1] For example, in August 2012, HDL's general counsel, Derek Kung, wrote a memo to HDL board members — including Mallory — explaining that its BlueWave contract posed a "high degree of risk" of violating the Anti-Kickback Statute. Kung explained that the U.S. Department of Health and Human Services's Office of the Inspector General "has provided commentary regarding its concern over independent contractor sales agreements with compensation based on a percentage of sales." He urged the Board to change to an "employee based sales system."

Similarly, HDL employee Nicholas Pace, a lawyer who oversaw HDL's compliance efforts, testified that he recognized that the Anti-Kickback Statute prohibited arrangements

---

[1] Because we conclude that the Government provided sufficient evidence to show that the commissions violated the Anti-Kickback Statute and accordingly the False Claims Act, we do not address the Government's other theories of liability.

7

like the commission-based one with BlueWave, and that he discussed these concerns in meetings with board members, including Mallory. He told the Board that HDL's arrangement with BlueWave was concerning because HDL "rel[ied] on a third party that owned the customer relationship, paying them tens of millions of dollars under that arrangement." And in November 2013, an attorney working for BlueWave sent Johnson the opinion in *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013), which upheld a conviction under the Anti-Kickback Statute based on the payment of commissions to a third party.

The Government also offered evidence that outside lawyers warned all three Defendants about the illegality of the commissions. Brian E. Dickerson, an attorney for BlueWave salesperson Emily Barron, testified that he cautioned BlueWave about problems with the commissions in September 2013. He recalled that Barron came to him with a legal opinion from another lawyer stating that both the P&H fees and the volume-based commission structure violated the Anti-Kickback Statute, so she asked him to review her contract with BlueWave. Dickerson agreed that the scheme was not legal and advised Barron to terminate her relationship with BlueWave.

Dickerson also attempted to reach someone at BlueWave who could offer a legal opinion as to its business practices. At one point, Mallory forwarded an email from Dickerson to her colleagues, including Dent and Johnson. In her email, Mallory stated that Dickerson "communicated to Derek [Kung] yesterday and again today that he has issues with the [BlueWave] contract."

8

Dickerson testified that he told three BlueWave attorneys directly that the commissions violated the Anti-Kickback Statute. He never received a legal opinion from BlueWave in response. Shortly thereafter, BlueWave fired Barron. From these clear warnings about the commissions scheme's potential illegality, a reasonable jury could certainly infer that Defendants "knowingly and willfully" offered or accepted remunerations in violation of the Anti-Kickback Statute.

Moreover, Defendants' justifications for their continued blind eye to illegal activity in no way undermines the jury's conclusion as to their knowledge. Defendants claim that because the Anti-Kickback Statute is ambiguous, they could have reasonably concluded that the statute did not prohibit volume-based commissions, and so they cannot have knowingly violated the False Claims Act. They rely on *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015), but that case involved a dispute over duties based on ambiguous contractual language, not a claim based on assertedly ambiguous statutory language. In any event, contentions "like these — that a defendant cannot be held liable for failing to comply with an ambiguous term — go to whether the government proved knowledge." *Id*. at 287. Here, unlike in *Purcell*, Defendants were repeatedly "warned away from [their] interpretation" of purportedly ambiguous terms, including by legal practitioners. *Id*. at 288. Ample evidence permitted the jury to conclude that Defendants willfully violated the Anti-Kickback Statute, and so knowingly violated the False Claims Act.

Nor do we find any more persuasive Defendants' contention that they could not have known about the commissions' illegality because attorneys helped draft the contracts

9

providing for commission payments. Defendants point to no legal opinion on which they relied in concluding that the Anti-Kickback Statute permitted commission payments to independent contractors. Moreover, the jury could have reasonably concluded that Defendants should have given more consideration to the many subsequent warnings about the commissions. *See U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) ("In determining whether [defendants] reasonably relied on" the advice of counsel, the jury "was entitled to consider all the advice given to it by any source." (internal citation omitted)).

Similarly, Defendants cannot rely on outside audits as a justification for questioning the legality of the commission scheme. These audits did not require the jury to find that Defendants acted legally. In fact, one auditor specifically explained that its services were "not designed, nor should they be relied upon, to disclose . . . illegal acts."

In sum, Defendants offer no argument or evidence that required the district court to grant them judgment as a matter of law. Rather, based on all of the evidence presented at trial, a reasonable jury could conclude that Defendants willfully paid commissions to independent contractors and, accordingly, that they knowingly violated the Anti-Kickback Statute. Of course, the jury did not have to reach this conclusion — but certainly the evidence offered by the Government permitted it to do so.

## B.

Defendants also contend that they are entitled to judgment as a matter of law because, assertedly, commissions to salespeople can never constitute kickbacks under the Anti-Kickback Statute. But no language in the statute so provides. Moreover, federal

10

appellate courts have frequently, and indeed invariably, upheld Anti-Kickback Statute violations based on commission payments to third parties. *See, e.g.*, *United States v. St. Junius*, 739 F.3d 193, 209–10 (5th Cir. 2013); *United States v. Vernon*, 723 F.3d 1234, 1256–58 (11th Cir. 2013); *United States v. Polin*, 194 F.3d 863, 864–66 (7th Cir. 1999).

The Anti-Kickback Statute does include a statutory safe harbor for commissions paid to salespeople who are "employee[s]" that have a "bona fide employment relationship" with their employer. 42 U.S.C. § 1320a-7b(b)(3)(B). But the Department of Health and Human Services has expressly recognized that this safe harbor does not cover independent contractors. In 1989, when considering regulatory safe harbors, the agency noted that "many commenters" wanted to expand the safe harbor "to apply to independent contractors paid on a commission basis," but it "declined to adopt this approach." 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989). The agency explained that it refused to do so because of the "many examples of abusive practices by sales personnel who are paid as independent contractors." *Id*. The Department then noted that if employers "desire to pay [] salesperson[s] on the basis of the amount of business they generate," they "should make these salespersons employees" to avoid "civil or criminal prosecution." *Id*. Two years later, in 1991, when the Department finalized its safe harbor rules, it again refused to apply the commissions safe harbor to independent contractors "because of the existence of widespread abusive practices by salespersons who are independent contractors." 56 Fed. Reg. 35,952 (July 29, 1991).

Defendants also argue that, because BlueWave sales representatives did not directly refer HDL or Singulex tests to patients, Defendants cannot be liable under the

11

Anti-Kickback Statute. But they misread the plain text of the statute. The statute expressly prohibits individuals from receiving remuneration in exchange for "arranging for or recommending purchasing" healthcare services. 42 U.S.C. §§ 1320a-7b(sb)(1)(B), (b)(2)(B). This includes sales representatives who are compensated for recommending a healthcare service, like the HDL or Singulex tests, to physicians. *See Vernon*, 723 F.3d at 1254 (explaining that no provision of the Anti-Kickback Statute is "limited to payments to physicians"); *Polin*, 194 F.3d at 866 (noting that § 1320a-7b(b)(2)(B) penalizes the recommendation of healthcare services, regardless of who recommends them). Again, Defendants' argument does not provide a basis for judgment as a matter of law.

## III.

In addition to their claim of entitlement to judgment as a matter of law, Defendants offer a litany of reasons why the district court assertedly erred in denying them a new trial. We review denials of a new trial for abuse of discretion, and a new trial is warranted only if the verdict is against the clear weight of the evidence, based upon false evidence, or will result in a miscarriage of justice. *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014).

## A.

First, Defendants contend that they are entitled to a new trial based on a variety of purported legal errors in the district court's jury instructions.

12

i.

Defendants argue that the district court erred in refusing to give a stand-alone advice-of-counsel instruction. To establish the advice-of-counsel defense, a "defendant must show the (a) full disclosure of all pertinent facts to [counsel], and (b) good faith reliance on [counsel's] advice." *Drakeford*, 792 F.3d at 381 (alterations in original) (quoting *United States v. Butler*, 211 F.3d 826, 833 (4th Cir. 2000)).

Defendants requested an instruction stating that they "have asserted an affirmative defense of advice of counsel to the Government's allegations that they violated the False Claims Act" and that the affirmative defense, "if true, will completely defeat the Government's allegations under the False Claims Act." The district court refused to give this instruction because it concluded that the instruction did not fit the facts of the case.

This was so, the court explained, because Defendants did not produce evidence that they made full disclosure of all pertinent facts to counsel, nor did they identify any specific legal opinion, written or otherwise, that they relied upon from HDL and BlueWave's formation until at least 2012. In response, Defendants point to an email sent by an attorney from the law firm LeClairRyan to his colleague in 2009. However, Defendants offered no evidence that they ever read this email. And in the email, the lawyer simply says that in his "recollection, P&H fees do[] not run afoul of Anti-[K]ickback," but he "want[ed] to confirm that no recent OIG [o]pinions have slipped past [him]." This is hardly a clear endorsement of the P&H fee structure.

13

Furthermore, although the district court did not give the advice-of-counsel affirmative defense instruction proposed by Defendants, it did instruct the jury to consider Defendants' "good faith" reliance on legal advice. The court explained:

> A defendant who acts with a good-faith belief that his or her conduct is lawful does not willfully violate the Anti-Kickback Statute even if that belief is mistaken . . . . In determining whether a defendant acted in good faith, you must consider the totality of the evidence presented. This includes all of the legal opinions and advice received by or known to the defendant, regardless of the source, to determine whether the defendant acted in good faith.

This charge captured the essence of Defendants' proposed instruction — if the jury found that Defendants, relying on the advice of counsel, had a good-faith belief that their conduct was legal, then they did not violate the Anti-Kickback Statute. Thus, the district court's refusal to give the stand-alone advice-of-counsel instruction that Defendants requested provides no basis for reversal. *See Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (only when a requested instruction is "not substantially covered by the court's charge to the jury" does an appellate court reverse).

ii.

Defendants' next challenge to the jury instructions arises from former BlueWave sales contractor Kyle Martel's invocation of the Fifth Amendment. The district court instructed the jury that:

> [I]f you find that [a] witness was a member of a conspiracy to violate the False Claims Act, you may but are not required to infer [from their] refusal [to testify] that the witness's answer would have been unfavorable to the interests of any co-conspirator.

At trial, the Government questioned Martel for 25 minutes, and he invoked the Fifth Amendment in response to nearly every question. The Government presented Martel with

14

a number of exhibits, including emails he sent marketing HDL's tests as a profit source. Defendants contend that the district court improperly instructed the jury that it could infer guilt from his silence.[2]

The Supreme Court has long recognized that there exists a "prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). And a "non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree" than a party's invocation of the privilege. *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) (quoting *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.,* 808 F.2d 271, 275 (3d Cir. 1986)) (internal quotation marks omitted).

In determining whether a district court may permit adverse inferences, we engage in a case-specific analysis. *See Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1481 (8th Cir. 1987). Courts generally follow the factors set forth by the Second Circuit in *LiButti*: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *LiButti*, 107 F.3d at 123–24.

---

[2] Defendants do not renew on appeal their trial challenge to the admission of Martel's invocation of his Fifth Amendment rights as violative of the Federal Rules of Evidence.

As a BlueWave contractor, Martel played a substantial role in Defendants' scheme. *See RAD Servs.*, 808 F.2d at 277 (permitting the jury to draw an adverse inference when the record was "replete with circumstantial evidence of" the witnesses' "involvement with the alleged plan"). The Government introduced evidence that BlueWave paid Martel nearly $6 million in commissions in exchange for selling HDL's tests. Evidence also showed that Martel emphasized physicians' ability to profit from P&H fees, a key component of the Government's case. And by requiring that the jury first find that Martel was a co-conspirator, the district court cabined its instruction, ensuring that the jury would only consider Martel's invocation of the Fifth Amendment to the extent it was relevant to their assessment of Defendants' liability.

It is immaterial that Martel no longer worked for BlueWave or HDL at the time of trial. Courts have often permitted invocation of the Fifth Amendment by a former employee of a company that is a party to the litigation. *See, e.g.*, *Cerro Gordo Charity*, 819 F.2d at 1481; *RAD Servs.*, 808 F.2d 271 at 276; *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983). Accordingly, we see no error in the jury instructions permitting the jury to make adverse inferences based on Martel's testimony.

iii.

Defendants raise two additional challenges to the jury instructions. Both are meritless.

Defendants first contend that the district court erred by failing to instruct the jury that it must find that a false claim be "material." Instead, the court instructed the jury that if it found that a claim violated the Anti-Kickback Statute, the second element of the False

16

Claims Act — that "[t]he claim was false or fraudulent" — was necessarily satisfied. The instruction was proper. The Anti-Kickback Statute expressly states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the False Claims Act. 42 U.S.C. § 1320a-7b(g). A violation of the Anti-Kickback Statute thus automatically constitutes a false claim under the False Claims Act. *See United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017) ("An [Anti-Kickback Statute] violation that results in a federal health care payment is a per se false claim under the [False Claims Act]."); *see also Guilfoile v. Shields*, 913 F.3d 178, 190–91 (1st Cir. 2019).[3]

Defendants also argue that the district court erred when it told the jury that the Government must prove "that at least one purpose of the remuneration" was to induce the referral of services, rather than the "primary purpose of the remuneration." This instruction, too, was proper, as every circuit to address the issue has held. *See, e.g.*, *United States v. Borrasi*, 639 F.3d 774, 781–82 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir.

---

[3] Defendants appear to argue that the district court should have also instructed the jury on the False Claims Act's "false statement" provision, which prohibits knowingly making or causing to be made "a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). But the theory of liability propounded by the Government — on which we base our holding — implicates only the "presentment" provision of that statute, which prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." *Id*. § 3729(a)(1)(A). The district court properly instructed the jury on the elements of a "presentment" claim, so Defendants' argument is not relevant here.

17

1998); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68, 71–72 (3d Cir. 1985).

B.

In addition to their jury-instruction arguments, Defendants contend that the district court abused its discretion by excluding three defense experts: Daniel Mulholland, a healthcare attorney; Jessica Schmor, a nurse; and Curtis Udell, a purported expert on the fair-market value of P&H fees.

Under Federal Rule of Evidence 702, the trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). In determining whether an expert's reasoning or methodology is scientifically valid, a court considers a host of *Daubert* factors, including whether the theory can be (and has been) tested; whether the technique is subject to peer review; the rate of error; the existence of standards controlling the technique's operation; and whether the technique has garnered general acceptance. *Id*. at 593–94.

The district court excluded Mulholland's testimony as to whether Defendants "would have reason to know what the legal obligations were." The court explained that this testimony presents a legal conclusion informing the jury about how it should apply the law, which is prohibited. *See United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). The district court excluded Schmor's testimony because her opinion did not rest on sufficient facts or data. Schmor, a nurse, sought to testify as to Medicare's reimbursement code calculations, but she lacked personal knowledge about Medicare's precise

18

methodology. Similarly, the district court excluded Udell's testimony because the Court found his methodology for calculating the fair market value of P&H fees unreliable. Udell based his calculation on the amount physicians charge for various services. Because physicians consistently inflate charges to ensure they receive full reimbursement from Medicare, the court concluded that Udell's proposed figures did not represent the actual value of the processing and handling services. In excluding the testimony of these experts, the district court did not abuse its discretion.[4]

## IV.

Finally, Dent challenges the district court's grant of prejudgment writs of attachment. At issue are three properties that Dent transferred to his wife and to two corporations that she controlled.

Pursuant to the Federal Debt Collection Procedures Act, the Government may obtain a prejudgment remedy in connection with a "claim for a debt." 28 U.S.C. § 3001. Under Subchapter D of the Act, the Government must first establish that a transfer is fraudulent. *Id*. § 3304. Then, the Government can rely on "applicable principles of equity"

---

[4] We summarily reject two additional, meritless contentions from Defendants. First, they argue that the jury rendered a fatally inconsistent verdict by imposing personal liability on Dent and Johnson but not BlueWave. The jury rendered a general verdict in this case, which in civil cases "must be accepted" notwithstanding any possible inconsistencies. *Hines v. IBG Int'l, Inc.*, 813 F.2d 1331, 1334 (4th Cir. 1987). Second, using cherry-picked data, Mallory argues that the $16,601,591 damages award against her improperly included certain false claims attributed to Singulex. Given the dearth of support for her argument and our "general reluctance to inquire into the workings of the jury," *United States v. Powell*, 469 U.S. 57, 69 (1984), this challenge cannot succeed.

to void the transfer, use a remedy against "the asset transferred or other property of the transferee," or seek "any other relief the circumstances may require." *Id*. § 3306(a).

The district court found that Dent's property transfers were fraudulent. A transfer is fraudulent if the debtor makes the transfer "with actual intent to hinder, delay, or defraud a creditor." *Id*. § 3304(b)(1)(A). The statute outlines certain factors courts should look to in determining intent in this context, including whether the transfer was to an insider, whether the debtor retained control of the property after the transfer, whether the debtor had been threatened with suit before the transfer, whether the value of the consideration was roughly equivalent to the value of the asset, and whether the debtor was insolvent. *Id*. § 3304(b)(2).

Many of these factors are present here. The timing of the transfers, as well as the nominal amount of consideration, cuts in favor of the Government. Dent made the transfers several months after he knew he was under federal investigation. He received a subpoena from the Department of Health and Human Services in January 2013. On May 1, 2013, he purchased a real property for $1.6 million, and sold it to his wife for $5 that same day — consideration far less than the value of the property. In August 2013, he sold a parcel of land that he had purchased for $2.75 million to his wife, again for $5. In February 2014, Dent sold six more properties to his wife for $5, and an island to one of his wife's corporate entities for $5.

Moreover, Dent transferred the properties to an insider — either to his wife or to corporations controlled by his wife. He retained possession and control of the properties, acknowledging that one of the properties at issue remains his "family home" and that his

20

parents reside in another.  Dent's actions meet the standard for a fraudulent transfer.  *See id*. § 3304(b)(2).  Accordingly, the district court did not err in granting the prejudgment writ of attachment.

V.

For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED*.